**Norman TIMBERLAKE, Appellant (Petitioner Below),**

v.

**STATE of Indiana, Appellee (Respondent Below).**

No. 49S00–9804–PD–252.

Supreme Court of Indiana.

Aug. 20, 2001.

&#9906;1431

Eric K. Koselke, Ann M. Sutton, Special Assistants to the Public Defender of Indiana, Indianapolis, IN, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Priscilla J. Fossum, James B. Martin, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

## ON PETITION FOR POSTCONVICTION RELIEF

BOEHM, Justice.

Norman Timberlake was convicted of the murder of Indiana State Trooper Michael Greene and of carrying a handgun without a license. He was sentenced to death. He appeals the denial of his petition for postconviction relief and raises four issues: (1) his competency during trial, direct appeal, and postconviction relief; (2) ineffective assistance of trial counsel; (3) ineffective assistance of appellate coun-

sel; and (4) bias of the postconviction court. · We affirm the trial court's denial of postconviction relief.

### Factual and Procedural Background

The facts of this case are reported in *Timberlake v. State*, 690 N.E.2d 243 (Ind. 1997). In brief, on February 5, 1993, Timberlake and Tommy McElroy stopped on Interstate 65 to urinate. Master Trooper Michael Greene pulled up behind them to investigate the car stopped on the roadside. A radio check identified McElroy as a person wanted by the police, and as Greene was handcuffing McElroy, Timberlake shot Greene. Timberlake was caught shortly thereafter in a lounge and charged with murder, escape, and carrying a handgun without a license. He was convicted of murder and the handgun violation and was sentenced to death. This Court affirmed his conviction and sentence on direct appeal. *Timberlake*, 690 N.E.2d at 250. After this Court issued its opinion, but before an order on rehearing was issued, Judith Menadue, Timberlake's appellate attorney, questioned his competency and filed a motion to hold the appeal in abeyance. This Court denied the motion and then denied rehearing.

Timberlake filed a petition for postconviction relief on December 7, 1998. After two recusals, Judge Steven Nation was appointed to hear the case. At the time Judge Nation assumed the case, the postconviction court had sua sponte ordered two experts to evaluate Timberlake's competency, but that process was not complete. Pursuant to Judge Nation's direction, on August 2, 1999, Timberlake filed a motion to determine his competency. After doctors interviewed Timberlake, competency hearings were held on September 15, September 29, and October 5, 1999. Judge Nation ruled Timberlake competent. This Court denied a request to present that issue on interlocutory appeal. The postconviction hearing was held on November 8, 9, 10, 12, and 15 and, on December 27, the postconviction court issued Findings of Fact and Conclusions of Law denying relief. This appeal ensued.

### Standard and Extent of Review

 Timberlake bore the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5). Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues, Timberlake must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Harrison v. State*, 707 N.E.2d 767, 773 (Ind.1999) (citing *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind.1995)). We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the postconviction court. *Id.* at 774.

 Postconviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind.1999). Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the postconviction rules. P C.R. 1(1); *Rouster*, 705 N.E.2d at 1003. If an issue was known and available, but not raised on direct appeal, it is waived. *Rouster*, 705 N.E.2d at 1003. If it was raised on appeal, but decided adversely, it is res judicata. *Id.* (citing *Lowery v. State*, 640 N.E.2d 1031, 1037 (Ind.1994)). If not raised on direct appeal, a claim of ineffective assistance of trial counsel is properly presented in a postconviction proceeding. *Woods v. State*, 701 N.E.2d 1208, 1215 (Ind.1998). A claim of ineffective assistance of appellate counsel is also an appropriate issue for postconviction review. As a general rule, however, most free-standing claims of error are not available in a

postconviction proceeding because of the doctrines of waiver and res judicata. Some of the same contentions, to varying degrees, may be properly presented in support of a claim of ineffective assistance of trial or appellate counsel. Because Timberlake's direct appeal raised a claim of ineffective assistance of trial counsel, we address the issues Timberlake raises in this appeal primarily as claims of ineffective assistance of his appellate counsel in presenting or omitting issues bearing on his claim of ineffective trial counsel. We also address those free-standing claims that are not barred by waiver or res judicata.

## I. Competency

### A. *At Trial*

Timberlake claims that he was incompetent during his initial trial and, therefore, his convictions and sentence must be reversed. The postconviction court held that this issue was waived because it was not raised on direct appeal. The postconviction court also noted that, before Timberlake was tried, two experts examined him and determined him to be competent. The postconviction court found, "Petitioner has produced no credible evidence that the conclusions reached by trial counsel's experts were wrong."

We agree with the postconviction court that the issue of Timberlake's competency at trial was known and available on direct appeal and is therefore not available as a freestanding claim in postconviction relief. *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind.1999). In any event, Timberlake has not established that he was incompetent at the time of trial. For that reason, to the extent failure to present the competency issue is presented here as appellate ineffectiveness, Timberlake does not establish the prejudice prong of *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For the same reason, Timberlake does not fall into the unusual category recognized in *Tinsley v. State*, 260 Ind. 577, 298 N.E.2d 429 (1973). In *Tinsley*, this Court ordered an evidentiary hearing on the issue of defendant's competency. The defendant first challenged his competency in a post-trial motion to correct error. In support of that motion the defendant submitted a finding of incompetency in a guardianship proceeding. This Court found that "[i]n certain unique situations facts coming to light only after the trial may be so significant and compelling as to create 'reasonable grounds' to question a defendant's competency at the time of his trial and therefore require a hearing on the question." *Tinsley's* "unique situation" is not presented here. Timberlake's competency was questioned by his trial counsel and Timberlake was examined by two doctors who concluded he was competent. Nor was there a contemporaneous finding of incompetency from another court.

To be competent at trial, a defendant must be able to understand the nature of the proceedings and be able to assist in the preparation of his defense. Ind.Code § 35–36–3–1 (1998); *Brewer v. State*, 646 N.E.2d 1382, 1384 (Ind.1995). In this appeal Timberlake points to incidents from more than ten years before his arrest, his conspiracy theories during his trial, and post-trial medical testimony as evidence that he was incompetent at the time of trial. The information about Timberlake's competency both before and after the trial is relevant but far from conclusive of his competency at trial. Competency is not a static condition. *Cf.* I.C. § 35–36–3–1. Given the contemporaneous findings of two doctors that he was competent at the time

of trial,[1] the postconviction court's finding that Timberlake has not established that he was incompetent at trial is more than amply supported by the record, and Timberlake fails to establish prejudice in counsel's failure to present the issue on direct appeal.

### B. On Direct Appeal

Timberlake also challenges his competency during the direct appeal. As a preliminary matter, we note that it is not at all clear that competency is required in a direct appeal. Cf. State v. White, 168 Ariz. 500, 815 P.2d 869, 878 (1991), abrogated on other grounds by State v. Salazar, 173 Ariz. 399, 844 P.2d 566 (1992); People v. Kelly, 1 Cal.4th 495, 3 Cal.Rptr.2d 677, 822 P.2d 385, 414 (1992); People v. Newton, 152 Mich.App. 630, 394 N.W.2d 463, 466 (1986), vacated on other grounds by 428 Mich. 855, 399 N.W.2d 28 (1987). The postconviction court made findings on this issue as well. Specifically, the court found that evidence of Timberlake's questionable competence was discovered after his appeal was decided, and, therefore, he had already assisted, as much as possible, in his appeal. After the opinion on direct appeal was issued in this case and while rehearing was pending, his appellate attorney, Menadue, filed a motion to hold the appeal in abeyance based on her perception that Timberlake was incompetent. At the time that this motion was filed, the appeal had been decided after having been fully briefed for fifteen months. That motion was denied by this Court.

■ We agree with the postconviction court that, even if competency is required for a direct appeal, Timberlake has not shown that he was incompetent at the relevant time. Menadue's suspicions about Timberlake's competency were not raised until long after she had filed his appellate briefs. Thus, even if Timberlake was unable to assist with his defense at that time, the postconviction court was correct in concluding that this presents no issue because the brief had already been filed and the issues already raised. There was testimony from Dr. Gelbort, a psychologist, that Timberlake was unable to assist in his defense at the time Menadue filed her motion. But this claim, even if accepted, does not establish his incompetency at the time his appeal was prepared and presented.

### C. At the Postconviction Relief Proceedings

■ Timberlake's postconviction counsel argue that mental illness prevented Timberlake from rationally consulting with them, thus depriving him of a fair postconviction proceeding.[2] Timberlake's counsel filed a motion to determine competency on August 2, 1999. Timberlake was examined by several doctors and competency hearings were held on September 15, September 29, and October 5, 1999. The postcon-

---

1. Although Timberlake now challenges these findings as "unreliable," he does not carry his burden of establishing that they were incorrect. Two doctors testified at the postconviction proceedings. One doctor called the findings of the reports created before the trial "suspect." Another testified that the reports could not be analyzed without viewing the raw data used to create them. As the postconviction court found, this testimony, even if fully accepted, does not establish Timberlake's incompetency at trial.

2. Postconviction counsel also argue that they "were unable to investigate, prepare, and present any type of cogent postconviction petition on behalf of Mr. Timberlake." To the extent this is an argument concerning Timberlake's competency, it is addressed below. To the extent it is an argument concerning counsel's own ineffectiveness, it cannot be raised. Etienne v. State, 716 N.E.2d 457, 463 (Ind.1999).

viction court ruled that Timberlake was competent to proceed. Timberlake sought to file an interlocutory appeal and moved to stay the postconviction proceedings due to incompetence. This Court denied both motions.

■■■ The claim of incompetence in a postconviction proceeding presents two distinct issues: (1) whether Timberlake was "incompetent," or unable to assist his counsel in the preparation of his case and to understand the nature of the postconviction proceedings, and (2) whether "competence," as that term is understood in cases addressing a defendant's due process rights at trial, is required in postconviction proceedings. The postconviction court found against Timberlake on the first issue. Because we agree that Timberlake's mental state did not render him unable to understand the nature of the proceedings and assist in his defense, we affirm the trial court's ruling on this point. We therefore leave for another day the State's plausible contention that competency is not required for postconviction proceedings. We observe, however, that it surely is not an inflexible requirement. It cannot be the case that in all circumstances an improperly convicted person has no remedy because of his incompetence. *Cf. Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), *rev'g Jackson v. State*, 253 Ind. 487, 255 N.E.2d 515 (1970).

The postconviction court did not address the second issue, but determined there was "[e]xtensive evidence ... heard on this [first] issue, and Petitioner was found competent to pursue post-conviction relief." His counsel report that Timberlake says there is a machine that is able to monitor his words and thoughts and has

been used to kill other prisoners.[3] According to his attorneys, Timberlake believes this machine to be the only issue relevant to his case, and he will not cooperate with them if he does not find his attorneys' actions or strategic decisions relevant to exposing the machine. His counsel contend that Timberlake's belief results from a mental disease that causes him to see the world only through a deluded version of reality.

The postconviction court applied the familiar standard for trial competency—the ability to understand the nature of the proceedings and assist in the preparation of his defense—as the standard for competency to pursue postconviction relief. *See* I.C. § 35–36–3–1(a); *Brewer*, 646 N.E.2d at 1384. The court then held multiple hearings on the issue and heard from four experts: Drs. Masbaum, Deaton, Crane, and Ochberg. All four found that Timberlake understood the nature of the proceedings. Two of the doctors, Masbaum and Crane, determined that, although Timberlake suffered from delusions, he was competent to assist in his own defense. The other two, Deaton and Ochberg, felt that Timberlake was delusional and could not cooperate or work adequately with postconviction counsel. After hearing all the evidence, the postconviction court determined that Timberlake was competent and made detailed findings as to Timberlake's competence.[4] These included:

> g. That the Court finds by its own observations that the Petitioner was able to conduct himself in an appropriate manner and was able to understand and comply with the commands and requests of the Court during the Court proceed-

---

3. The postconviction court found that "[t]here is no machine that monitors Petitioner's mind and/or controls his thoughts."

4. The final findings were in significant part adopted from the State's proposed findings, but the record does not suggest this is true of the findings as to competency.

ings. Such observations by the Court were consistent with the psychiatric testimony presented in the cause. Further, the Court finds that Petitioner was able to understand and follow the commands and requests of the Bailiffs and/or Police Officers during Court proceedings. Finally, as set forth in the psychiatric testimony, the Court finds that the Petitioner was able to understand and comply with commands or requests of his counsels [sic].

h. That the Petitioner has shown an extensive knowledge and memory of the proceedings and has also demonstrated that he is well versed in the law. He is very exacting that statements found in pleadings and statements in the courtroom be correct.

. . . .

i. Court finds that the Petitioner understands that he has been convicted of a capital crime, that he was not successful on the appeal of such conviction and that these proceedings are his last attempt to review this case, and if he is not successful in this proceeding or if necessary upon appeal, he will be executed.

Because Timberlake has not established that the evidence unmistakably points to a contrary conclusion, he cannot prevail on this claim.

We conclude that the postconviction court's ruling on Timberlake's competency is supported by this record, though no single item is conclusive. It seems clear that Timberlake was able to understand the nature of the proceedings against him.[5] Second, although Timberlake may not have cooperated with his lawyers when he disagreed with their strategies, he has not established that he was unable to assist in his own defense. We have no basis to dispute his attorneys' contention that he was, and presumably is, an extremely difficult client. Nevertheless, counsel were able to converse with him and provide an adequate postconviction review of his convictions and sentence. Timberlake's postconviction counsel conducted a five-day hearing with thirty-two witnesses and forty-eight exhibits. Some of these issues were those that Timberlake was concerned about in a list of potential grounds for postconviction relief. Timberlake even participated in some of the questioning by, for example, writing questions for his counsel to ask witness McElroy. Although medical opinion was divided on this point, two doctors also testified that Timberlake could assist in his own defense.

In sum, although Timberlake was difficult and had outbursts, he was also able to understand the nature of the proceedings and assist his counsel and the court when need be. Given the evidence from the doctors that Timberlake satisfied the trial competency standard, the almost one

---

5. All four doctors agreed on this point. This can also be seen from Timberlake's activities. The issues he discussed as potential grounds for postconviction relief demonstrated that Timberlake understood the nature of the proceedings and could assist his attorneys. Although his list contained numerous references to the machine, Timberlake also challenged appellate counsel's focus on his sentencing when he believed that the guilt phase was more important. He identified issues with the cross-examination of McElroy. As one of the doctors observed, Timberlake understood who his attorneys were and expressed dissatisfaction with one of them, understood that there had been a judge change, and had a file full of legal documents pertaining to his situation. The postconviction court observed that Timberlake, although occasionally unruly, was generally able to follow commands and conduct himself in court. Several times throughout the proceedings, Timberlake discussed the case and took note of the relevant proceedings, including that his competency has been decided four times.

thousand pages of the evidence on Timberlake's present medical state, the postconviction court's own observations and discussions, and the deference we give to a trier of fact's determination of competency, we cannot say that the facts point unswervingly toward a result opposite the one reached by the postconviction court. *See Matheney v. State,* 688 N.E.2d 883, 893 (Ind.1997).

## II. Ineffective Assistance of Trial Counsel

For several reasons, Timberlake argues that this Court should revisit the issue of trial counsel ineffectiveness that was addressed in the direct appeal. *Timberlake,* 690 N.E.2d at 259–61. First, Timberlake argues that some instances of trial counsel ineffectiveness were not raised in the direct appeal and are therefore not barred by res judicata and must be addressed now.

This issue was recently addressed by this Court in *Ben–Yisrayl v. State,* 738 N.E.2d 253, 259 (Ind.2000):

> In *Woods,* we held that a defendant may raise a claim of ineffective assistance of trial counsel for the first time in a post-conviction proceeding, but we emphasized that once the defendant chooses to raise his claim of ineffective assistance of trial counsel (either on direct appeal or post-conviction), he must raise all issues relating to that claim, whether record-based or otherwise. 701 N.E.2d at 1220. A defendant who chooses to raise on direct appeal a claim of ineffective assistance of trial counsel is foreclosed from relitigating that claim. *Id.* ("[I]neffective assistance of trial counsel is not available in post-conviction if the direct appeal raises any claim of deprivation of Sixth Amendment right to counsel."). *See also Bieghler v. State,* 690 N.E.2d 188, 200–01 (Ind.1997) ("Some of the [defendant's

arguments on post-conviction appeal] are new arguments about aspects of trial counsel's performance we considered on direct appeal; others focus on aspects not mentioned earlier. In either case, the earlier ruling that trial counsel was not ineffective is *res judicata."*); *Sawyer v. State,* 679 N.E.2d 1328, 1329 (Ind.1997) ("[The defendant], having once litigated his Sixth Amendment claim concerning ineffective assistance of counsel, is not entitled to litigate it again, by alleging different grounds."); *Morris v. State,* 466 N.E.2d 13, 14 (Ind. 1984) ("Notwithstanding the fact that petitioner gave several additional examples of his counsel's alleged ineffectiveness during the post-conviction hearing, a consideration of the ineffectiveness issue would constitute review of an issue already decided on direct appeal.").

In his direct appeal, Timberlake raised, and this Court considered and rejected, a claim of ineffective assistance of trial counsel. *Timberlake,* 690 N.E.2d at 259–61. Res judicata thus bars him from relitigating this issue in postconviction proceedings. The postconviction court erred as a matter of law in considering the merits of the defendant's claim directly challenging trial counsel's effectiveness.

Second, Timberlake claims that trial counsel ineffectiveness should be revisited because "the initial decision was clearly erroneous." Because he does not explain how this Court's decision was clearly erroneous, or present a cogent argument as to how this case presents the "extraordinary circumstance" where "the initial decision was clearly erroneous and would work [a] manifest injustice" necessary to avoid res judicata, this claim is waived. Former Ind. Appellate Rule 8.3(A)7 (now App. R. 46(A)8); *Conner v. State,* 711 N.E.2d 1238, 1247 (Ind.1999).

Third, Timberlake claims that trial counsel worked on the direct appeal and, therefore, the question of trial counsel's ineffectiveness should have been postponed for postconviction relief and is now available. For the reasons given in Part III of this opinion, counsel in the direct appeal were not under an impermissible conflict of interest in raising this claim and appellate counsel's decision to raise trial counsel ineffective assistance of counsel was not deficient performance. Therefore, this argument fails as well.

## III. Ineffective Assistance of Appellate Counsel

Timberlake claims that his appellate counsel was ineffective for raising trial counsel ineffective assistance of counsel on direct appeal when several of the instances of trial counsel ineffectiveness needed information outside of the record and should have been preserved for postconviction relief. Otherwise stated, he contends that Menadue unreasonably took the risk of precluding undeveloped claims that remained and also raised claims that were not supported by the record. He also raises claims based on issues that were addressed on direct appeal, apparently challenging the appellate presentation of these issues.

### A. *The Elements of Appellate Ineffectiveness*

██ A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). First, the defendant must show that counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. This requires a showing that counsel's representation fell below an ob-

jective standard of reasonableness, *id.* at 688, 104 S.Ct. 2052, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment, *id.* at 687, 104 S.Ct. 2052. Second, the defendant must show that the deficient performance prejudiced the defense. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

██ Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. *Id.* at 689, 104 S.Ct. 2052. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. 2052. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. *Id.* at 689, 104 S.Ct. 2052. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Bieghler v. State,* 690 N.E.2d 188, 199 (Ind.1997); *Davis v. State,* 598 N.E.2d 1041, 1051 (Ind. 1992); *Ingram v. State,* 508 N.E.2d 805, 808 (Ind.1987). The two prongs of the *Strickland* test are separate and independent inquiries. Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Williams v. State,* 706 N.E.2d 149, 154 (Ind.1999) (quoting *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052).

█ This Court has recognized three categories of alleged appellate counsel ineffectiveness: (1) denying access to an appeal, (2) failing to raise issues, and (3) failing to present issues competently. *Bieghler,* 690 N.E.2d at 193–95. When the claim of ineffective assistance is directed at appellate counsel for failing fully and properly to raise and support a claim of ineffective assistance of trial counsel, a defendant faces a compound burden on postconviction. The postconviction court must conclude that appellate counsel's performance was deficient and that, but for the deficiency of appellate counsel, trial counsel's performance would have been found deficient and prejudicial. Thus, Timberlake's burden before the postconviction court was to establish the two elements of ineffective assistance of counsel separately as to both trial and appellate counsel. *Ben–Yisrayl v. State,* 738 N.E.2d 253, 261–62 (Ind. 2000).

### B. *Timberlake's Claims*

As a preliminary matter, Timberlake's claim of ineffective assistance of appellate counsel appears to consist of several parts and subparts: (1) appellate counsel was ineffective for raising trial counsel ineffectiveness in the direct appeal (a) by reason of participation of trial counsel in the appeal and (b) for having raised the issue at all; (2) appellate counsel was ineffective in raising shortcomings of trial counsel in the guilt phase by either (a) not raising claims or (b) not adequately supporting them; and (3) appellate counsel was ineffective in presenting trial counsel's errors in the penalty and sentencing phases, either by (a) not raising claims or (b) not adequately supporting them.

### 1. *Appellate Ineffectiveness for Raising Ineffective Assistance of Trial Counsel*

█ Timberlake first claims that appellate counsel was ineffective for raising trial counsel's ineffectiveness on direct appeal because one of the trial attorneys, Ellen O'Connor, was also appellate counsel. Timberlake claims that this created a conflict of interest that requires review of this contention under the standard set forth in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), for claims of conflicted counsel. The postconviction court found, "Trial counsel Ellen O'Connor was originally appointed as co-counsel because of her relationship with Petitioner, but Menadue asked O'Connor to withdraw her appearance, which O'Connor did, before the briefs were written. O'Connor did not participate in the writing or review of the appellate briefs." Although O'Connor's motion to withdraw was denied by this Court, the postconviction court's finding of no actual conflict of interest is supported by testimony from both Menadue and O'Connor that O'Connor did not write or review the appellate brief. That finding is not clearly erroneous and eliminates the factual predicate of this contention.

Timberlake also argues that appellate counsel was ineffective for raising three grounds of trial counsel ineffective assistance of counsel in the direct appeal: (1) failure to confront McElroy with evidence challenging his credibility, (2) failure to present mitigation evidence at the penalty phase, and (3) failure to present and argue mitigation at the sentencing phase. He argues that these claims should have been preserved for postconviction because there was not an adequate record on direct appeal to establish prejudice. The postconviction court did not directly address this contention, but observed that Timberlake argued that these claims of ineffective trial assistance were raised on appeal "without sufficient investigation."

█ To prevail on this claim, Timberlake must show not only that appellate

counsel performed deficiently by raising these claims on direct appeal, but also that evidence established in postconviction relief would have proved trial counsel's ineffectiveness. Because Timberlake has failed to establish deficient performance by his appellate counsel, he has not satisfied his burden.

■ At the time of Timberlake's direct appeal, *Woods v. State*, 701 N.E.2d 1208 (Ind.1998), had not been decided. Appellate counsel Menadue testified that the case law in Indiana was "not crystal clear" as to when ineffective assistance of trial counsel should be raised. Indeed, in *Woods* we acknowledged this ambiguity: "Despite the frequency with which challenges to the effectiveness of trial representation appear in postconviction petitions in this State, this Court has not conclusively resolved whether waiver of this claim (1) always arises from a failure to raise it on direct appeal, or (2) never does, or (3) turns on whether there was or might have been a need for extrinsic evidence to assess either attorney competence or prejudice." *Id.* at 1213. Menadue testified in postconviction relief that she concluded that she was required to raise the trial counsel ineffectiveness claims that appeared on the face of the record or risk waiver of these claims. Menadue raised the issue of trial counsel ineffective assistance of counsel on direct appeal after consultation with Timberlake's trial counsel and investigation staff and several other attorneys. She faced the choice of either raising the claims on direct appeal without the benefit of extensive extra-record research or risking waiver. Although in hindsight, her decision may not have been the best one, that is not the standard by which we evaluate her actions. As this Court has stated, "Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight." *Spranger v. State*, 650 N.E.2d 1117, 1121 (Ind.1995). Judged by this standard, Menadue's decision did not fall below an objective standard of reasonableness.

### 2. Appellate Ineffectiveness as to Guilt Phase Claims

#### a. Failure to Present Evidence, Argument, or Instructions on Intoxication

Timberlake also argues that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for not pursuing an intoxication defense. The postconviction court addressed this as an issue of trial counsel ineffective assistance of counsel and found that trial counsel was not ineffective for failing to pursue an intoxication defense because it was inconsistent with Timberlake's principal claim that he was not the shooter. Moreover, there was evidence that Timberlake drank both before and after the shooting, making any conclusions about his intoxication level at the time of the murder highly speculative.

■ Appellate counsel did not raise this issue on appeal. Therefore, this claim is reviewed as a *Bieghler* type two issue, that is, failure to present an issue. This Court has noted several times the need for a reviewing court to be deferential to appellate counsel on this issue:

> [T]he reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made.

*Bieghler*, 690 N.E.2d at 194. This Court has approved of the two-part test used by

the Seventh Circuit to evaluate these claims: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986)). Otherwise stated, to prevail on a claim of ineffective assistance of appellate counsel, "a defendant must show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy." *Ben–Yisrayl*, 738 N.E.2d at 260–61.

■ Menadue filed a 154–page brief and raised twenty-eight issues. She thoroughly reviewed the record and interviewed trial counsel and other members of Timberlake's legal team before choosing what issues to raise on appeal. She was not deficient for failing to raise this issue because it was neither significant nor carried a reasonable probability of success. Although there was evidence that Timberlake was intoxicated at the time of the murder, he has not established that this defense would have had a reasonable probability of success at trial. Under the law at the time, in order to succeed on a defense of voluntary intoxication, the intoxication had to be so severe as to preclude the defendant's ability to form the requisite mens rea. *Ferguson v. State*, 594 N.E.2d 790, 792 (Ind.1992). Evidence that the defendant could plan, operate equipment, instruct the behavior of others, carry out acts requiring physical skill, disengage and leave the scene, and find his way to a friend's home seeking aid show

that his intoxication was not so great as to relieve him from responsibility for his acts. *Id.* (citing *Hughett v. State*, 557 N.E.2d 1015, 1017–18 (Ind.1990)). Here, Timberlake was able to shoot Greene, flee the scene of the crime, and then phone for assistance. There was no reasonable probability that the defense would have succeeded at trial.[6]

■ Timberlake's argument fails for a second reason as well. We think it is clear that trial counsel was not deficient for failing to raise Timberlake's intoxication at the guilt phase. Timberlake's defense was that McElroy did the shooting. Trial counsel's decision not to pursue a voluntary intoxication defense was a reasonable professional decision to avoid seemingly inconsistent defenses. Because trial counsel was not deficient, appellate counsel cannot be deficient for failing to raise this issue.

b. *Failure to Raise Trial Counsel's Cross Examination of Hood*

■ Timberlake also challenges the handling of State witness Roy Hood. Hood was a passing motorist who claimed to have seen a man fitting Timberlake's description shoot Greene. Before trial, Hood made several inconsistent statements about the incident. At the postconviction relief proceeding, Hood testified that when he saw Greene, he had already been shot. Also, at the postconviction relief hearing, a coworker of Hood's testified that Hood had told specific lies to him and was a liar with a bad reputation in the community. The postconviction court again addressed this issue only in terms of ineffective assistance

---

**6.** Timberlake also argues that "intoxication could have served as a defense to the mental state required to make [his] murder conviction eligible for the death penalty." His death penalty eligibility was based on killing an officer acting in the course of duty. For the same reasons a defense of intoxication would have failed under the circumstances of this case, there is not a reasonable probability that intoxication would have succeeded as a defense to the mens rea requirement of the death penalty aggravating circumstance.

of trial counsel: "[T]rial counsel was intimately familiar with the State's case and witnesses and many—if not all—significant witnesses were deposed by trial counsel. Petitioner cannot show that trial counsel performed deficiently in this regard."

Because appellate counsel did not raise this issue on appeal, it again presents a *Bieghler* type two issue. Therefore, Timberlake must show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy. *Ben–Yisrayl*, 738 N.E.2d at 260–61. This issue does not appear to be a significant and obvious one. In any event, it would not have established trial counsel ineffectiveness. Although Hood was not questioned at trial about all the inconsistencies discovered by postconviction investigation, trial counsel did cross-examine Hood on several discrepancies in his statements. As we noted in the direct appeal: "As defendant made clear during his cross-examination of Hood, there were inconsistencies. However, the basic points of his testimony remained the same and were corroborated by others." *Timberlake*, 690 N.E.2d at 253 n. 1. We cannot say that the postconviction evidence unmistakably and unerringly points to a conclusion contrary to the postconviction court's on the issue of trial counsel's performance in this respect. Furthermore, Timberlake has not established that appellate counsel was deficient based on the information available to her— which did not include information on Hood's reputation for dishonesty—at the time of the direct appeal. Because Timberlake has established neither deficient performance nor prejudice on this point at the trial level, this issue was not an obvious one which appellate counsel was deficient for failing to raise.

### c. Inadequate Presentation of Trial Counsel's Cross–Examination of McElroy

Timberlake claims that appellate counsel ineffectively raised trial counsel's ineffectiveness in failing to cross-examine McElroy. Menadue challenged trial counsel's handling of McElroy, *Timberlake,* 690 N.E.2d at 260, but Timberlake now claims that she was ineffective in her handling of this claim because the postconviction record established that McElroy was under the influence of anti-psychotic drugs, was undergoing counseling, and had been threatened with the death penalty, all of which may have affected his perceptions on the day of the shooting and were not presented in her claim of trial counsel ineffective assistance of counsel. The postconviction court found this claim to be res judicata as to trial counsel ineffective assistance of counsel and did not address it as to appellate ineffective assistance of counsel.

■ This claim asserts a type three *Bieghler* error. This Court observed that "[c]laims of inadequate presentation of certain issues, when such were *not* deemed waived in the direct appeal, are the most difficult for convicts to advance and reviewing tribunals to support." *Bieghler,* 690 N.E.2d at 195 (emphasis in original). These claims are reviewed under the highest standards of deference to counsel's performance and relief will be awarded only where "the appellate court is confident it would have ruled differently." *Id.* at 196.

■ We do not believe that Timberlake has established either prong of the *Strickland* test with respect to this claim. Menadue's failure to include evidence of McElroy's medications in her challenge to trial counsel's handling of his cross-examination does not rise to the level of deficient performance given the role and function of

appellate counsel on direct appeal. First, Menadue cannot "be measured by information unknown to appellate counsel but later developed after the appeal by post-conviction counsel." *Ben–Yisrayl*, 738 N.E.2d at 261. Second, McElroy was questioned extensively at trial and at postconviction and his version of events never changed with respect to his identification of Timberlake. *Timberlake*, 690 N.E.2d at 252 ("McElroy did not waver in his identification of defendant as the shooter, nor was his testimony unsupported by other witnesses or circumstantial evidence. The jury was aware of the inconsistencies and was faced with the responsibility of judging the credibility of the witnesses and determining what occurred."). Finally, the record challenging this omission does not establish a reasonable probability that McElroy's perception was clouded.[7] The postconviction evidence therefore does not establish a reasonable probability of a different result. Because Timberlake did not establish trial counsel ineffectiveness on this point, he cannot establish that appellate counsel was ineffective for inadequate presentation of this issue.

### 3. Appellate Counsel's Failure to Raise Trial Counsel's Ineffectiveness as to Penalty Phase Claims

Timberlake also challenges appellate counsel's handling of trial counsel's performance during the penalty and sentencing phases.

#### a. Failure to Present Evidence, Argument, or Instructions on Intoxication

■ Timberlake first argues that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness in not presenting any evidence, argument, or instructions on intoxication at the penalty and sentencing phases. Although the postconviction court did not address the intoxication issue specifically, it did note that appellate counsel was not ineffective for failing to raise eighteen specific claims of ineffective assistance of trial counsel because Timberlake cannot show that these alleged errors of trial counsel denied him a fair trial.

This claim was not raised in the direct appeal, and is thus a *Bieghler* type two issue. As we noted earlier, reviewing courts are particularly deferential to appellate counsel's decisions on what issues to raise. Using the two-part test from *Bieghler*, it is clear that although the issue of intoxication was obvious from the face of the record, it is not clearly stronger than the issues raised by appellate counsel. Menadue raised twenty-eight issues in her appellate brief, including that trial counsel was ineffective at all three phases of the trial. She also raised four instances of ineffectiveness in the guilt phase, including trial counsel's failure to present mitigation evidence. Although intoxication may be a mitigating factor, this Court does not require it to be considered. *See Legue v. State*, 688 N.E.2d 408, 411 (Ind.1997). As already noted, Timberlake was able to fire a gun, escape, and place a telephone call for help. We cannot say that it was unreasonable to raise the arguments that were presented in lieu of a claim of trial ineffectiveness based on inadequate presentation of intoxication as mitigation.

#### b. Appellate Counsel's Handling of Trial Counsel's Failure to Present Any Mitigation Evidence at Penalty Phase

■ Timberlake claims that appellate counsel ineffectively presented trial coun-

---

**7.** Testimony at the postconviction proceeding established that McElroy had taken two Mellarill pills the day of the shooting, was under- going counseling, and had been on anti-psychotic medication when he was incarcerated shortly before the shooting.

sel's ineffectiveness for failure to present mitigation evidence at the penalty phase. Specifically, Timberlake claims that trial counsel was ineffective for failing to subpoena any witnesses for the penalty phase and for failing to present expert witnesses, and that this led to the presentation of no mitigation evidence.

Menadue raised this issue in the direct appeal and this Court concluded that trial counsel "may have reasonably concluded that to argue any mitigation evidence would be ineffective and would open the door to damaging rebuttal." *Timberlake*, 690 N.E.2d at 261. The postconviction court, in addressing this issue as one of trial counsel ineffectiveness, stated that "[t]here can be no question that trial counsel also conducted a proper mitigation investigation[,] effectively investigated the strength of the State's request for the death penalty[,] and presented the most appropriate defense to that request, given the facts of the Petitioner's crime and his lengthy criminal history."

Under the deferential standard of review of this claim, Timberlake has failed to establish his claim of appellate counsel ineffective assistance of counsel for two reasons. First, he has not established that Menadue's handling of the issue on direct appeal was deficient. From the information known to Menadue and available in the record, she cannot be deficient for failing to contend that the lack of subpoenas was the cause of the deficient performance. This information only became available in postconviction relief, and, thus, is not relevant to her performance. Furthermore, because the lack of mitigation evidence was ascertainable from the record, Menadue did not err in raising this issue on direct appeal. *See* Part III.A.

Second, Timberlake has not established that there was prejudice from trial coun-

sel's failure to present mitigation evidence and, therefore, any prejudice from appellate counsel's performance. The death penalty aggravator in this case is Indiana Code section 35–50–2–9(b)(6), the killing of a police officer in the course of duty. As we have previously noted,

The killing of a police officer in the course of duty is a most serious crime. Police officers routinely risk their lives in the sometimes high stakes gamble of protecting society. They do a job that we all want and need done, though few of us possess the bravery and skill to do. They ask for little in return, but they do ask for some protection. The General Assembly recognized this in enacting the statutory aggravator of Indiana Code § 35–50–2–9(b)(6). The seriousness of this aggravator is magnified in the present case due to defendant's use of such deadly force to kill an unaware and unsuspecting police officer in an otherwise nonviolent and ordinary arrest.

*Lambert v. State*, 675 N.E.2d 1060, 1066 (Ind.1996) (citations omitted). Although trial counsel could have presented evidence of Timberlake's difficult childhood and substance abuse problems, this evidence has previously been held to be not very weighty. *See Coleman v. State*, 741 N.E.2d 697, 700 (Ind.2000); *Peterson v. State*, 674 N.E.2d 528, 543 (Ind.1996). In this case, Timberlake shot a police officer for no apparent reason after the officer had allowed Timberlake to go free. This situation is, if anything, more egregious than *Lambert*, where the defendant had been arrested by the police officer he killed. Furthermore, Timberlake's mitigation evidence was that his family was poor, his parents were alcoholics, and Timberlake had a problem with alcohol. Although Timberlake's father was physically abusive, the evidence is not nearly as disturbing as that presented in *Coleman*.[8] As in

---

8. In *Coleman,*

Coleman offered testimony, inter alia, that

this case, Coleman's counsel presented no mitigating evidence, but relied instead on a general religious and moral argument against the death penalty and a request for mercy. We concluded that:

> Taking into consideration all the evidence, both presented and omitted, and our previous holdings that a difficult childhood carries little mitigating weight, we conclude that it is extremely unlikely that the sentencing result would have been different had Coleman's trial counsel presented credible evidence of Coleman's childhood abuse and neglect. Because we find no reasonable probability that Coleman would have avoided a death sentence based on the omitted evidence, Coleman's claim of IAC at the penalty and sentencing phase of his trial fails under the second prong of *Strickland*.

*Coleman*, 741 N.E.2d at 703.

Given the minor weight of the mitigators and the aggravator present in this case, there is not a reasonable probability that the jury would have found the mitigators to outweigh the very weighty aggravator. Because appellate counsel was not deficient and there was no trial court prejudice, Timberlake fails on this claim.

#### c. *Failure to Present Any Mitigation Evidence at Sentencing Phase*

Timberlake also challenges appellate counsel's presentation of trial counsel's failure to present mitigation evidence in the sentencing phase. Appellate counsel raised this issue on direct appeal, and for the same reasons discussed above in Part III.B.3.b, Timberlake fails on this claim as well.

### IV. Postconviction Court Bias

Finally, Timberlake claims that he was deprived of his due process right to a fair and disinterested tribunal because of bias on the part of Judge Nation.

██ ██ The law presumes that a judge is unbiased and unprejudiced. *In re Edwards*, 694 N.E.2d 701, 711 (Ind.1998); *Smith v. State*, 535 N.E.2d 1155, 1157 (Ind. 1989). Our Judicial Code provides that when a judge's impartiality might be reasonably questioned because of personal bias against a defendant or counsel, a judge is to recuse himself. Ind. Judicial Conduct Canon 3(E)(1)(a); *accord Edwards*, 694 N.E.2d at 710. The test for determining whether a judge should recuse himself or herself under Judicial Canon 3(E)(1) is whether "an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *Edwards*, 694 N.E.2d at 711. Timberlake has not satisfied this test.

#### A. *Ex Parte Communications*

██ Timberlake argues that Judge Nation engaged in an ex parte communication with Dr. Masbaum, an expert witness, in violation of Judicial Canon 3(B)(8). Generally, the Code of Judicial Conduct prohibits a judge from engaging in ex parte conversations that relate to pending proceedings. Jud. Canon 3(B)(8); *accord Bell v. State*, 655 N.E.2d 129, 131 (Ind.Ct. App.1995). An exception to this general rule is found under Judicial Canon

---

his mother was a gambler and a prostitute who "starved, beat & hustled" her children. Coleman spent most of his childhood in conditions of squalor, living with a grandmother who practiced voodoo and who told Coleman that his mother had discarded him in a trash can when he was born. The grandmother verbally vilified and physically beat Coleman. She addressed him by his widely-known nickname "Pissy" because Coleman had bedwetting problems through his early teens.

*Coleman*, 741 N.E.2d at 701 (citations omitted).

3(B)(8)(a), which permits ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters of a pending case. Under this exception, the judge must: (1) reasonably believe that no party will gain a procedural or tactical advantage and (2) promptly notify all other parties of the substance of the ex parte communication and allow an opportunity to respond. *James v. State*, 716 N.E.2d 935, 940–41 (Ind.1999).

■ On September 28, 1998, Masbaum conducted an initial examination of Timberlake. On August 30 and September 2, 1999, Timberlake filed objections to the participation of Masbaum. Judge Nation contacted Masbaum and informed him of the objections against him[9] and provided Masbaum with a copy of these proceedings. These objections were discussed in a hearing on September 2, and were overruled. In an order on that hearing, Judge Nation stated:

> The Petitioner's request to exclude Dr. Masbaum as a Court appointed psychiatrist is hereby denied on the grounds that there has been insufficient evidence presented to this Court to show any impropriety which may exclude Dr. Masbaum from such examination. The Court advised the parties that Court staff will contact Dr. Masbaum to determine whether he would wish to serve in such capacity and the parties should be advised that Dr. Masbaum has agreed to continue as the Court appointed psychiatrist.

During Masbaum's second interview with Timberlake he determined that Timberlake was competent. Timberlake claims that the trial judge's ex parte communications with Masbaum prejudiced him because they led to a different diagnosis.

Judge Nation's communication with Masbaum falls under the ministerial exception to the bar on ex parte communications. Under the *James* test, Judge Nation reasonably believed that neither side gained a tactical advantage and notified both parties of the communications. Therefore, this communication does not present a reasonable basis for doubting Judge Nation's impartiality.

### B. *Interference in Attorney–Client Relationship*

■ Timberlake also alleges that Judge Nation was biased and damaged the attorney-client relationship between Timberlake and his counsel. As examples of how Judge Nation "damaged the attorney-client relationship," Timberlake points to the trial judge's handling of the competency issue, comments to Timberlake, and allowing evidence of the machine to be admitted and discussed. As a preliminary matter, we note that Timberlake cites no authority for this proposition. Turning to the first allegation, Timberlake contends that Judge Nation undermined Timberlake's confidence in his attorneys by requiring them to raise the competency issue. It appears that Judge Nation handled the issue as he did because he believed it was the correct legal procedure. Client disagreements with counsel often arise as a result of court rulings. We see no basis for a claim that the judge attempted to interfere with Timberlake's attorney-client relationship.

---

**9.** It is not entirely clear what this contact entailed. The only testimony on this point is from a competency hearing in which defense counsel asked Masbaum: "[S]o you were—okay—did there come another occasion you were aware, or see any pleadings in reference to that matter?" Masbaum responded, "Well, the Judge—uh—indicated to me that I was—that there was a pleading to take me off the case. That's what I understood."

Judge Nation's handling of Timberlake, including comments about Timberlake's understanding of events and investigation of the machine, also do not support his claim of bias. Judge Nation appears to have done his best to deal with a difficult defendant and to ensure that his rights were being protected.

None of the claimed actions by Judge Nation are responsible for a breakdown in the attorney-client relationship or constitute proof of bias. In fact, when ruling on Timberlake's counsel's motion to withdraw, the trial judge praised postconviction counsel: "I know that he is a difficult client, in that, he has a strong opinion as to what he feels needs to be in the record or what witnesses need to be called. It's obvious that you disagree with him concerning some of these directions. But from the standpoint of the Court, I think you're very—both of you are very good counsel." Timberlake has not established that there was a reasonable basis for challenging Judge Nation's impartiality.

C. *Refusal to Medicate*

 Finally, Timberlake claims that Judge Nation was biased when he refused to order any medication for Timberlake. Timberlake's counsel filed a motion requesting that he be treated. Judge Nation denied this request. Timberlake claims that this denial illustrates the judge's bias against Timberlake in light of the medical evidence that Timberlake was psychotic.

As a preliminary matter, we again note that Timberlake cites no authority for this proposition. Judge Nation held a lengthy hearing on the issue of Timberlake's competency and then determined that Timberlake was competent to proceed without medical treatment. Timberlake himself stated several times that he wanted no medication. Because we cannot say that this finding is clearly erroneous, *see* Part I,

Judge Nation's decision to deny medication does not appear to reasonably question his impartiality.

### Conclusion

The judgment of the postconviction court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.