## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 20 2018, 10:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Andre Payne
Michigan City, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Andre Payne,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 20, 2018

Court of Appeals Case No.
71A03-1602-PC-351

Appeal from the St. Joseph Superior Court

The Honorable Elizabeth C. Hurley, Judge

Trial Court Cause No.
71D08-1106-PC-35

**Mathias, Judge.**

[1] Andre Payne ("Payne") appeals the post-conviction court's denial of his petition for post-conviction relief. Payne raises two issues for our review which we restate as:

    I.    Whether changes in two witnesses' testimony constitute newly discovered evidence warranting post-conviction relief; and

    II.    Whether there was insufficient evidence presented at trial to rebut his self-defense claim.

[2] We affirm.

## Facts and Procedural History

[3] A panel of this court set forth the facts and initial procedural history pertaining to Payne's attempted murder and voluntary manslaughter convictions as follows:

> During the early morning of October 26, 2008, Dominque Wells was driving his girlfriend's mother's Impala. Victorio Belcher and another man, known to Wells only as Robert, were passengers in the vehicle. At approximately 1:00 a.m., Wells drove to a Marathon gas station in downtown South Bend and parked next to a fueling pump.
>
> Payne, Anthony Brown, Mark Murphy, and Quintin Ferrguson also were driving around that morning in Ferrguson's Oldsmobile. Brown possessed a .22 caliber handgun, and Payne possessed a .9 mm handgun. When they drove by the Marathon gas station, they noticed the Impala parked there. Believing that the Impala belonged to a female friend, they parked on the other side of the fueling pump.

Brown, Ferrguson, Belcher, and Wells, who all knew each other, exited their respective vehicles and began arguing. Wells noticed that Brown had a ".22 or something" caliber gun in his hand. (Tr. 259). Eventually, Brown got back in the Oldsmobile's driver's seat; Ferrguson got in the front passenger's seat; and Payne got in the back seat, where Murphy had remained. When Brown got back into the Oldsmobile, he threw his gun "on the seat between [him] and [Ferrgusson]." (Tr. 308).

Belcher then approached the Oldsmobile "with his gun drawn out talking about, is that Murph, is that Murph," and pointing his gun at the occupants. (Tr. 308). Ferrguson therefore picked up Brown's gun and began shooting toward Belcher. Ferrguson and Belcher exchanged numerous rounds of gunfire. Both sustained gunshot wounds.

Brown, Payne, and Murphy immediately took Ferrguson to a hospital. *Payne then drove Brown and Murphy to a friend's house to "get some more bullets" for Brown's gun.* (Tr. 343).

At approximately 3:00 a.m., Brown, Murphy, and Payne left their friend's house and drove to Kelly's Pub, a bar located west of the Marathon gas station. Payne still possessed his .9 mm handgun, which he kept on his lap as he drove. When they arrived at the bar, they noticed Wells'[s] uncle in the bar's parking lot. Brown shot at him from the still-moving Oldsmobile. Murphy then reloaded the gun with bullets and gave the gun back to Brown.

In the meantime, Wells had dropped Belcher and Robert off at a hospital and returned home. Shortly thereafter, Bradley Walls picked up Wells, and the two of them left in Bradley's vehicle. Bradley had a "small" gun, which he kept between the front seats. (Tr. 267).

At approximately 3:45 a.m., Bradley and Wells drove to a Taco Bell. They soon left after Wells observed Ferrguson's Oldsmobile. Payne, however, followed them out of the parking lot.

After leaving the Taco Bell parking lot, Bradley and Wells drove a short distance before stopping for a traffic light at an intersection. Payne stopped to the left of, but not even with, Bradley's vehicle. Thus, the Oldsmobile's "front passenger side window was even with the back driver's side window of" Bradley's vehicle. (Tr. 227).

Murphy, who was sitting in the Oldsmobile's front passenger seat, heard Payne say, "duck. . . ." (Tr. 335). Payne then began shooting "[a]cross" Murphy and out of Murphy's window, which had been "shot out already." (Tr. 336). Brown, who was sitting directly behind Murphy, also started shooting toward Bradley's vehicle. Brown fired eleven shots; "[a]ll [his] shots went to the door." (Tr. 401). Although Payne "said they had a gun," *at no time did Murphy or Brown see any of the occupants of Bradley's vehicle with a gun.* (Tr. 338).

When Wells realized that Payne had followed them, he immediately "dropped [his] head" because he "knew they were going to start shooting." (Tr. 267). Wells then heard "[s]omebody out of that car start shooting" but could not see who was shooting at him. (Tr. 268). Once the shooting began, Wells tried to fire Bradley's gun, but "the gun wouldn't shoot." (Tr. 269). He therefore threw the gun out of the vehicle. Wells heard Bradley say, "I'm hit . . . ." (Tr. 268). Bradley's vehicle then started moving forward approximately one block, until it struck a pole. Bradley died at the scene.

An autopsy revealed that Bradley sustained only one gunshot wound. The bullet entered his left side, traveled through several

organs, and pierced his aorta, killing him. The forensic pathologist recovered "a bullet within the right chest wall area after it had gone through the ribs." (Tr. 438).

Officers collected shell casings from a .40 caliber semiautomatic handgun and a .22 caliber handgun at the Marathon gas station. Officer also collected a "spent .22 caliber single shell casing" in the parking lot of Kelly's Pub. (Tr. 464). Officers processing the scene at the intersection of Main Street and LaSalle Avenue collected ten spent shell casings from a .22 caliber weapon. Officers also discovered a ".32 caliber semiautomatic handgun ... lying in the middle of LaSalle Street just west of the intersection of LaSalle and Main"; however, they did not discover any .32 caliber shell casings at the scene or in Bradley's vehicle. (Tr. 475).

Officers processing Bradley's vehicle counted fifteen bullet holes in the driver's side. They discovered several bullet holes in the "left quarter panel" of the trunk area; "the left rear passenger side door"; and the "left driver's door." (Tr. 482). Officers collected a ".22 caliber bullet fragment" from the "left rear quarter panel trunk area . . . ." (Tr. 484). They also collected "two partial projectiles and jacketing which ended up matching a .9 mm projectile" from the left-rear passenger door as well as "a single projectile in the bottom of the left driver's side door which also was a .9 mm . . . ." (Tr. 485). An analysis of the bullet hole in the driver's side door determined that the .9 mm projectile entered "almost perpendicular" to the door. (Tr. 488).

Officers processing the Oldsmobile discovered "bullet strikes on the left side of the vehicle . . . ." (Tr. 453). Officers found no damage on the right, or passenger, side of the vehicle. They also recovered a .40 caliber bullet from the Oldsmobile and another .40 caliber bullet from Ferrguson.

Detective Sergeant Ray Wolfenbarger, a firearm and tool mark examiner for the South Bend Police Department's Crime Laboratory, examined the .22 caliber shell casings recovered at the Marathon gas station, Kelly's Pub, and the intersection of Main Street and LaSalle Avenue. He determined all of the casings to be ".22 long rifle caliber casing[s] . . . marketed by Remington" and fired by the same weapon. (Tr. 512). He further determined that the bullet fragments collected from Bradley's vehicle were fired from a ".9 mm Lugar caliber." (Tr. 516). He also verified that the bullet removed from Bradley's body during his autopsy was consistent with a .9 mm Lugar caliber. Officers did not recover either Payne's or Brown's gun.

On January 22, 2009, the State charged Payne with Count I, felony murder; and Count II, attempted murder, a class A felony. On June 15, 2009, the trial court commenced a four-day jury trial.

Payne testified that as he pulled up along the side of Bradley's vehicle, he saw Wells "look[ ] back" and "reach over" as Bradley ducked his head. (Tr. 583). He also testified that he saw a gun in Wells'[s] hand; heard Brown say that Wells had a gun; and that Wells then "started shooting . . . ." (Tr. 583). Payne further testified that he fired three shots.

The jury found Payne guilty of class A felony voluntary manslaughter and class A felony attempted murder. Following a sentencing hearing on July 14, 2009, the trial court sentenced Payne to consecutive sentences of thirty years for voluntary manslaughter and thirty years, with ten years suspended, for attempted murder.

*Payne v. State*, No. 71A05-0908-CR-435, 2010 WL 1132557, at *1–*3 (Ind. Ct. App. Mar. 25, 2010) (emphases added).

[4] On direct appeal, Payne claimed that the evidence was insufficient to rebut his claim of self-defense beyond a reasonable doubt. *Id.* at *3. We disagreed and explained, "Payne's argument is merely a request to reweigh the evidence and judge the credibility of witnesses, which we may not do." *Id.* at *4.

[5] Payne first filed for post-conviction relief on June 29, 2011. He amended his petition both orally and in writing several times, and evidentiary hearings were held on March 15, 2015, and October 9, 2015. During the hearings, Payne questioned his trial counsel, his appellate counsel, Mark Murphy ("Murphy"), and Anthony Brown ("Brown"). He also submitted several exhibits, two of which were affidavits from Murphy and Brown modifying the account they gave at trial regarding the night of the shooting.

[6] On January 13, 2016, the post-conviction court denied Payne's petition. In relevant part, the court found that the changed testimony from Murphy and Brown constituted impeachment evidence and not newly discovered evidence. Appellant's App. p. 111. The court also did not find the changed testimony credible and determined that it was not likely to produce a different result at trial. *Id.* at 111–12.

[7] Payne now appeals.

## Post-Conviction Standard of Review

[8] The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Willoughby v. State*, 792 N.E.2d 560, 562 (Ind. Ct. App. 2003), *trans. denied*. When a petitioner appeals the denial of a

petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. On appeal, we do not reweigh evidence nor judge the credibility of witness; therefore, to prevail, Payne must show that the evidence in its entirety leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6), we do not defer to the court's legal conclusions, but the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Henley v. State*, 881 N.E.2d 639, 644 (Ind. 2008).

## Change in Testimony

[9] Payne first contends that the post-conviction court erred by not granting him a new trial in light of what he describes as newly discovered perjury evidence. Our supreme court has explained:

> [N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Taylor v. State*, 840 N.E.2d 324, 329–30 (Ind. 2006) (citation omitted). It is Payne's burden to show that *all* nine requirements have been met. *Id.* at 330.

Payne has not shown that the affidavits and accompanying testimony meet all the criteria. Most notably, the change in testimony would be used merely to impeach Brown's and Murphy's trial testimony. Impeachment is "[t]he act of discrediting a witness, as *by catching the witness in a lie* or by demonstrating that the witness has been convicted of a criminal offense." *Taylor*, 840 N.E.2d at 330 n. 1 (quoting Black's Law Dictionary 768 (8th ed. 2004)). However, impeaching evidence and "merely impeaching" evidence are not the same. "[E]vidence which destroys or obliterates the testimony upon which a conviction was obtained is not appropriately considered as merely impeaching evidence." *Wilson v. State*, 677 N.E.2d 586, 588 (Ind. Ct. App. 1997) (citing *Dennis v. State*, 103 Ind. 142, 2 N.E. 349, 355 (1885)).

Both Brown and Murphy testified at trial: (1) that they traveled with Payne to retrieve more bullets on the night of the shooting; and (2) that they did not see Wells with a gun in the other car. Trial Tr. Vol. 2, pp. 337–38, 343–44, 377, 387–89. Now, based on the affidavits submitted and their testimony at the post-conviction hearing, Brown and Murphy allege: (1) that they did not travel to retrieve more bullets on the night of the shooting; and (2) that they did see Wells with a gun in the other car. Ex. Vol., Petitioner's Ex. H; Appellant's App. pp. 75–76; Post-Conviction Tr. May 15, 2015, pp. 9, 17–18; Post-Conviction Tr. Oct. 9, 2015, p. 65. Payne argues that these circumstances warrant a new trial. We disagree.

Murphy testified that he did not lie during Payne's trial, but rather, "[a]t the time it was a misunderstanding. We planned the whole night and the situation

had occurred. The bullets was [sic] already confirmed they were already in the car." Post-Conviction Tr. May 15, 2015, p. 9. Conversely, Brown testified that he did lie at trial. Post-Conviction Tr. Oct. 9, 2015, pp. 70, 73, 75. Regardless, the now changed testimony of both Murphy and Brown is a clear example of "merely impeaching" evidence. It does nothing more than undermine both witnesses' credibility.

[13] Even assuming that both Murphy and Brown committed perjury during Payne's trial, our supreme court has explained, "Despite the greater impeachment power of a perjury conviction, it is still merely impeaching." *Downs v. State*, 482 N.E.2d 716, 719 (Ind. 1985). Moreover, both Murphy and Brown were impeached during Payne's trial with inconsistent statements. *See, e.g.,* Trial Tr. Vol. 2, pp. 352–359, 394–409. Accordingly, their changed testimony now does not warrant relief for Payne. *See Pannell v. State*, 36 N.E.3d 477, 491–92 (Ind. Ct. App. 2015), *trans. denied.*

[14] Because Payne has failed to show that the change in testimony "is not merely impeaching," the post-conviction court did not err when it determined that Payne had failed to offer newly discovered evidence.[1]

---

[1] Payne also consistently asserts that the prosecution knowingly presented false testimony. *See* Appellant's Br. 10–13. We agree with the State that "this claim is really a claim that the prosecutor failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." Appellee's Br. at 13. And because Payne has failed to support these assertions with a cogent argument, and because he failed to bring this claim on direct appeal, it is waived. *See* Ind. Appellate Rule 46(A)(8)(a); *Allen v. State*, 791 N.E.2d 748, 755 (Ind. Ct. App. 2003), *trans. denied.*

# Insufficient Evidence

[15] Payne next claims that "[t]here is not sufficient evidence of probative value to support the conclusion of the trier of fact . . . that self[-]defense was negated by the State beyond a reasonable doubt." Appellant's Br. at 15. However, the purpose of a petition for post-conviction relief is to raise issues that were unknown or unavailable to Payne at the time of the original appeal. *Taylor*, 840 N.E.2d at 330. And this issue was available to Payne at the time of his original appeal. In fact, it is the exact issue he raised in his direct appeal. *Payne*, 2010 WL 1132557, at \*3–\*4. Therefore, he cannot now raise the same claim again as it is barred by res judicata. *See Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001) (holding that if a claim "was raised on appeal, but decided adversely, it is res judicata.").

# Conclusion

[16] Based on the facts and circumstances before us, the post-conviction court did not err when it denied Payne's petition for post-conviction relief. Accordingly, we affirm.

Najam, J., and Barnes, J., concur.