**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 28 2014, 10:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN A. KINDLEY**
Lakeville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WILLIAM CROCKETT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | No. 71A04-1307-PC-374 |
| vs. | ) | |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable T. Edward Page, Senior Judge
Cause No. 71D01-0605-PC-13

**May 28, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

William Crockett appeals from the denial of post-conviction relief of his 2005 murder conviction. On appeal, Crockett contends that the post-conviction court erroneously determined that his appellate counsel was not ineffective for presenting a claim of ineffective assistance of trial counsel on direct appeal, thereby foreclosing that issue for post-conviction review.

We affirm.

The facts underlying Crockett's murder conviction as found by this court on direct appeal are as follows:

> Crockett and his cousin, Antrone, were drug dealers in South Bend. During the spring of 2002, Don and Doris Langenderfer (collectively, the Langenderfers) began delivering drugs and collecting money for Crockett. The Langenderfers were paid in either cash or in crack cocaine for their efforts.
> Sometime in October 2002, Michael Wright, a friend of the Langenderfers, also began running drugs for Crockett. Later that month, Crockett informed Wright that Don owed him money, and that Crockett might have to kill Don. Crockett also told Brian Kyle, his drug supplier, that he thought Don might be working with an undercover police officer. Crockett stated that he would not go to prison and that he would "handle it." Tr. p. 562.
> On October 24, Crockett, Antrone, and Wright delivered some cocaine to an individual known as "Domino." Tr. p. 434, 440. Crockett purportedly told Domino that he thought Don had contacted the police about Crockett's drug activities, and that Don would have to disappear. Crockett stated that he might have to take Don for a "ride in the country." Tr. p. 435-36. The next day, Antrone, Wright, and Crockett went to a hotel and Crockett stated that he was tired of Don "messing up his money" and that it was time for Don "to disappear." Tr. p. 441. Crockett telephoned Kyle and informed him that he was going to be out of town for a couple of days.
> On October 26, Crockett told Wright and Antrone that he wanted Don "taken care of" that night, and that he was leaving for Fort Wayne. Tr. p. 440, 444. Crockett then instructed Antrone and Wright to call Don and direct him to meet them at some location "out in the country." Tr. p. 446. In particular, Crockett told Wright to call Don. Wright was to inform Don that the police had followed him and that he and Antrone had to throw some drugs out of their car window. Wright was to ask Don to assist him in searching for the drugs.

2

Crockett also told the others to go to their apartment and retrieve a .44 caliber revolver so that they could shoot Don with it. He also told Wright to dispose of the gun after killing Don. Finally, Crockett instructed Antrone and Wright to sell whatever drugs they had and to collect the money.

Later on that same day, Crockett and two friends—Dawn Buwa and Lindsay Rider—left for Fort Wayne in Crockett's Cadillac, while Antrone and Wright departed in Crockett's gray Grand Marquis automobile. Antrone and Wright sold some drugs that afternoon, retrieved the gun from the apartment, and located an area in the country to kill Don. Around 2:00 a.m., Wright called the Langenderfers' home from a pay phone at a Park-N-Shop Supermarket. Doris handed the telephone to Don, whereupon Wright related the "story" to Don about the police chase and the discarded drugs. Don got dressed and left the house, informing Doris that he would return later.

Antrone and Wright then drove back to the rural area and waited for Don to arrive. Approximately ten minutes later, Don arrived, and Antrone was waiting for him in a cornfield. Antrone shot Don once in the face with the .44 caliber revolver. Antrone then ran back to the Grand Marquis where Wright had been waiting. As the two left the scene, Antrone informed Wright that he "blew Don's face off" and that he "got him good." Tr. p. 463. At some point, Antrone tossed the gun from the vehicle.

The next morning, David Manspeaker and a friend were driving to a golf course when they noticed Don's van parked in the middle of Ardmore Trail. Manspeaker then noticed Don lying face-up in the cornfield. After discovering that Don was dead, Manspeaker contacted the police.

At approximately 6:40 a.m. on that same morning, Crockett telephoned Antrone and directed Antrone and Wright to meet him at a house on Chicago Street. In the meantime, Doris woke up and discovered that Don was not at home. As a result, she contacted the hospital and the police. Sometime later, South Bend Police Officer David Newton arrived at the Langenderfers' home and informed Doris that Don was dead. It was determined that Don had died of a single gunshot wound that entered his chin, passed through his mouth, and severed his spinal chord.

When Crockett returned from his trip, he informed Kyle that he and "old boy" had to "take a guy on a drive," "four-four to the head, four-five, all to the head, to the face, ain't comin' back." Tr. p. 564. Crockett was shaking and panicking, stating that the body probably had not been found because it was located in a field. Crockett, Antrone, and Wright then had a conversation about what had occurred earlier that morning. Specifically, Crockett asked if everything went all right, whether they made sure that Don was dead, and whether they had disposed of the gun. After asking for the drug proceeds from the previous afternoon, Crockett handed Wright $100 and some crack cocaine. Crockett then told Wright to take the Grand Marquis and leave town. Kyle

3

arrived at the scene and noticed that Wright was attempting to remove the left rear tire from the vehicle. Crockett told Kyle that a skid mark was left at the scene of the murder and that he would have to "torch" the vehicle if the tire could not be removed. Tr. p. 569, 579.

Wright then drove to Lafayette in the Grand Marquis and briefly stayed with family members before his mother informed him that the police wanted to speak with him. Wright then contacted the police and told them where he had left the vehicle. Wright then returned to South Bend and spoke with Officers Keith Hadary and David Newton on October 29. While Wright initially denied any involvement in the shooting, he subsequently told the officers that Antrone had shot Don and that the gun could be found "off Pine Road." Tr. p. 259-61, 471-74. Acting on this information, the police located the gun, which was later identified to have fired the bullet that killed Don. They also discovered a Seagram's gin bottle that was subsequently tested and linked to Antrone through DNA testing. The South Bend Police Department then bought a bus ticket for Wright to move to Las Vegas where he stayed for approximately six months with family members.

In October 2003, Wright returned from Las Vegas to South Bend and gave another statement, wherein he admitted his involvement in the shooting. South Bend police officers then interviewed Crockett, who admitted to Officer Timothy Corbett that he knew that Wright and Antrone were involved in the murder. Tr. p. 359-60. Crockett repeatedly indicated that the State should offer him a "deal" with regard to the incident. Tr. p. 359. Crockett stated that he was in Fort Wayne when Don was killed, and he identified Wright as the shooter.

Thereafter, in October 2003, Crockett, Antrone, and Wright were charged with murder. The State later amended the information to include a charge of conspiracy to commit murder. Wright pleaded guilty to the conspiracy charge in exchange for his testimony at Crockett's trial.

*Crockett v. State*, No. 71A03-0506-CR-263, slip op. at 2-6 (Ind. Ct. App. December 28, 2005). Additional facts will be provided where necessary.

In 2004, a jury found Crockett guilty of murder and conspiracy to commit murder. In January 2005, the trial court entered a judgment of conviction for murder and sentenced Crockett to sixty-five years imprisonment.[1] Crockett filed a direct appeal, and this court

---

[1] The trial court merged the conspiracy to commit murder conviction into the murder conviction.

affirmed his conviction in a memorandum decision. Crockett filed a petition for post-conviction relief in May 2006. After several amended petitions, Crockett filed his last amended petition on December 3, 2012. The post-conviction court held a hearing on December 7, 2012, and issued its findings of fact and conclusions of law denying Crockett post-conviction relief on April 12, 2013. In response to a motion to correct error, the post-conviction court entered amended findings of fact and conclusions of law on June 28, 2013, affirming the denial of post-conviction relief. Crockett appeals this denial.

Post-conviction proceedings are civil proceedings in which the defendant must establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Ben-Yisrayl v. State,* 738 N.E.2d 253 (Ind. 2000), *cert. denied* (2002). Post-conviction proceedings do not afford the petitioner an opportunity for a super appeal, but rather, provide the opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal. *Ben-Yisrayl v. State,* 738 N.E.2d 253; *Wieland v. State,* 848 N.E.2d 679 (Ind. Ct. App. 2006), *trans. denied.* The proceedings do not substitute for a direct appeal and provide only a narrow remedy for subsequent collateral challenges to convictions. *Ben-Yisrayl v. State,* 738 N.E.2d 253.

When a petitioner appeals a denial of post-conviction relief, he appeals from a negative judgment. *Fisher v. State,* 878 N.E.2d 457 (Ind. Ct. App. 2007), *trans. denied.* The petitioner must establish that the evidence as a whole unmistakably and unerringly leads to a conclusion contrary to that of the post-conviction court. *Id.* We will disturb a post-conviction court's decision as being contrary to law only where the evidence is without

conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Wright v. State,* 881 N.E.2d 1018 (Ind. Ct. App. 2008), *trans. denied.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Lindsey v. State,* 888 N.E.2d 319 (Ind. Ct. App. 2008), *trans. denied.* We accept the post-conviction court's findings of fact unless they are clearly erroneous, and no deference is given to its conclusions of law. *Fisher v. State,* 878 N.E.2d 457.

On direct appeal, Crockett's appellate counsel presented four substantive issues: (1) the admission of evidence under Ind. Evidence Rule 404(b); (2) prosecutorial misconduct; (3) ineffective assistance of counsel (three separate claims); and (4) conflict of interest. This court rejected Crockett's claims and affirmed his murder conviction. As part of his request for post-conviction relief, Crockett argues that his appellate counsel was ineffective because he presented the issue of ineffective assistance of trial counsel on direct appeal, thereby precluding him from presenting such issue during post-conviction proceedings. *See Woods v. State*, 701 N.E.2d 1208 (Ind. 1998).

In order to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must demonstrate both that counsel's performance was deficient and that the petitioner was prejudiced thereby. *Kubsch v. State,* 934 N.E.2d 1138 (Ind. 2010) (citing *Strickland v. Washington,* 466 U.S. 668 (1984)). This is the so-called *Strickland* test. Counsel's performance is deficient if it falls below an objective standard of reasonableness and "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed

6

to the defendant by the Sixth Amendment." *Id.* at 1147 (quoting *Strickland v. Washington,* 466 U.S. at 687)).

To establish the requisite prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Smith v. State,* 765 N.E.2d 578, 585 (Ind. 2002). The two elements of *Strickland* are separate and independent inquiries. The failure to satisfy either component will cause an ineffective assistance of counsel claim to fail. *Taylor v. State,* 840 N.E.2d 324 (Ind. 2006). Thus, if it is easier to dispose of such a claim on the ground of lack of sufficient prejudice, that course should be followed. *Landis v. State,* 749 N.E.2d 1130 (Ind. 2001).

Although a criminal defendant claiming ineffective assistance of trial counsel is at liberty to elect whether to present this claim on direct appeal or in post-conviction proceedings, it is well-settled that a post-conviction proceeding is generally the preferred forum for adjudicating claims of ineffective assistance of trial counsel because the presentation of such claims often requires the development of new evidence not present in the trial record. *See Jewell v.* State, 887 N.E.2d 939 (Ind. 2008); *Woods v. State*, 701 N.E.2d at 1220 (noting "some grounds supporting an assertion of inadequate representation will not be reasonably knowable, much less fully factually developed, until after direct appeal"). If, however, a defendant chooses to raise a claim of ineffective assistance of counsel on direct appeal, "the issue will be foreclosed from collateral review." *Woods v. State*, 701 N.E.2d at

7

1220. This rule should "likely deter all but the most confident appellants from asserting any claim of ineffectiveness on direct appeal." *Id.*

To prevail upon a claim that appellate counsel was ineffective for raising an ineffective assistance of trial counsel claim on direct appeal, the defendant must show that appellate counsel performed deficiently by raising this claim on direct appeal and that the evidence presented during post-conviction proceedings proved trial counsel's ineffectiveness. *See Timberlake v. State*, 753 N.E.2d 591 (Ind. 2001). *See also Allen v. State*, 749 N.E.2d 1158 (Ind. 2001); *Ben-Yisrayl v. State*, 738 N.E.2d 253 (Ind. 2000) (stating that when a claim of ineffective assistance is directed at appellate counsel for failing to fully and properly raise a claim of ineffective assistance of trial counsel on direct appeal, a defendant faces a compound burden on post-conviction of showing ineffective assistance of both trial and appellate counsel).

On direct appeal, Crockett's appellate counsel presented three claims of ineffective assistance of trial counsel for this court's review—(1) trial counsel's failure to object to the admission of character evidence of other bad acts; (2) trial counsel's failure to object to two alleged instances of prosecutorial misconduct; and (3) trial counsel's failure to identify a conflict of interest. This court rejected each claim of ineffective assistance of counsel. During the post-conviction hearing, Crockett's appellate counsel acknowledged that ineffective assistance of counsel claims should rarely be raised on direct appeal, but explained that he decided to present such issues on direct appeal because he "thought [they] were supported by facts that were in the record" and were "legitimate appellate issues."

8

*Transcript of Post-Conviction Hearing* at 85. Crockett's appellate counsel further stated that, case law notwithstanding, in his "opinion," he did not believe that raising a claim of ineffective assistance of counsel on direct appeal would necessarily preclude the petitioner from raising the issue again on completely different grounds through a petition for post-conviction relief. *Id.* at 87.

Crockett's appellate counsel clearly misunderstood the state of the law insofar as it was his "opinion" that presenting claims of ineffective assistance of counsel on direct appeal would not foreclose Crockett from presenting additional claims of ineffective assistance of counsel during post-conviction proceedings. *Id.* Since our Supreme Court's decision in *Woods v. State*, *supra*, it has been clear that such is in fact the effect of presenting a claim of ineffective assistance on direct appeal – any additional claims of ineffective assistance of counsel are foreclosed from collateral review. While appellate counsel's decision to present such issue on direct appeal was, in part, a tactical decision, it cannot be said that his misunderstanding or "opinion" of the law could serve as the basis for sound appellate strategy. That said, the post-conviction court properly concluded that Crockett's claim of ineffective assistance of appellate counsel nonetheless failed because Crockett did not establish prejudice resulting from appellate counsel's decision to raise an ineffective assistance of trial counsel claim on direct appeal.

To fully understand Crockett's claims, it is important to know that Crockett made two statements to police. Crockett makes no claim regarding the admission of his first statement to police on November 1, 2002. Crockett made a second videotaped statement to police on

9

October 23, 2003. During the jury trial, Officers Timothy Corbett and Randy Kaps testified regarding statements Crockett made during the October 23 videotaped interview. Neither the recording nor a transcript of this second statement was introduced at trial.

Crockett's claim that he received ineffective assistance of appellate counsel is based on his contention that raising the claim of ineffective assistance of trial counsel on direct appeal unnecessarily precluded him from raising claims of ineffective assistance of trial counsel based on errors that were not apparent in the record. Specifically, Crockett maintains that his videotaped statement establishes additional claims of ineffective assistance of trial counsel that were not raised on direct appeal. In support of his petition for post-conviction relief, the videotaped statement was introduced into evidence.

In this appeal from the denial of his petition for post-conviction relief, Crockett alleges four instances of ineffective assistance of trial counsel that were not and could not have been presented on direct appeal without the additional evidence of Crockett's videotaped statement to police. Specifically, Crockett contends that trial counsel failed to object to testimony from Officer Timothy Corbett that Crocket asked for a "deal" during his videotaped statement to police, which Crockett claims was a gross mischaracterization and created an impression in the jury's mind that he was admitting his guilt. *Trial Transcript* at 359. Further, Crockett asserts that trial counsel was ineffective because in attempting to respond to trial testimony that he requested a "deal", trial counsel opened the door to the admission of evidence that Crockett had been arrested for sexual offenses. Third, Crockett maintains that his trial counsel failed to elicit testimony from Officers Corbett and Kaps that

10

Crockett had repeatedly asserted his innocence during his videotaped statement. Fourth, Crockett contends that his trial counsel was ineffective for failing to object to any and all testimony by Officers Corbett and Kaps concerning any and all of Crockett's statements made during the October 23, 2003 videotaped interview on grounds that (1) the statement was made prior to *Miranda* warnings, (2) the statement was made in connection with plea negotiations, and/or (3) Crockett's statement was made after he had invoked his right to counsel, yet Officers Corbett and Kaps continued with police-initiated custodial interrogation.

Although the post-conviction court found that the manner in which Crockett's statement (as seen on the videotape) was obtained was "troubling in several respects," the post-conviction court ultimately concluded that any error in the admission of evidence related to the police interview was "harmless."[2] *Appellant's Appendix* at 148, 154, respectively. We agree with the post-conviction court's assessment.

Officer Corbett's testimony during trial that Crockett requested a "deal" in exchange for information concerning Langenderfer's murder likely had minimal, if any, impact on the jury's verdict. Crockett maintains that the inference to be drawn from the fact that he requested a deal was that he was in fact guilty of or somehow implicated in Langenderfer's murder. This inference, however, was dispelled by testimony that Crockett had another motive for requesting a deal. Although Crockett's trial counsel arguably opened the door to evidence that Crockett was involved in other criminal matters, the trial court closed that door

11

when it sustained trial counsel's objection regarding the nature of the other criminal matter and instructed the jury to disregard any testimony related thereto. Further, we note that there was also testimony that Crockett only learned of Langenderfer's murder two days after it occurred and that Crockett was out of town at the time of Langenderfer's murder. Considered together, any testimonial reference to the fact that Crockett wanted to make a deal in exchange for information about Langenderfer's murder was not, as characterized by Crockett, "tantamount" to a confession. *Reply Brief* at 2.

With regard to his protestations of his innocence during the videotaped interview with police, as noted above, Crockett's defense was that he had an alibi at the time of the murder. Evidence was introduced that Crockett was out of town at the time of the murder and that he only learned of the murder two days after it occurred. The jury was made aware that Crockett denied any involvement in Langenderfer's murder.

Finally, Crockett claims that his videotaped statement was in violation of *Miranda*, made in connection with plea negotiations, and/or illegally obtained after he had invoked his right to counsel and therefore any reference thereto violated his rights. Crockett does not support any of these claims with citations to authority. In any event, as noted above, the trial testimony that referenced portions of his statement to police was not the evidence that sealed his fate. To be sure, there was evidence from eye witnesses, consistent in relevant aspects, that Crockett was the mastermind behind Langenderfer's murder. Wright's testimony revealed that Crockett had become frustrated with Langenderfer and had decided that it was

---

[2] The post-conviction court also stated that the testimony referencing Crockett's statement to police did not

time for Langenderfer "to disappear" and that he directed Antrone Crockett and Michael Wright to "take[] care of" Langenderfer by meeting him "out in the country." *Trial Transcript* at 441, 444, 446, respectively. Wright further testified that Crockett gave them instructions on where to obtain a gun in Crockett's apartment and that they were to dispose of the gun after the murder was carried out. Crockett made arrangements to be out of town when the murder was carried out. The following morning, Crockett contacted Antrone and Wright to make sure they had followed through with the plan. This evidence clearly implicates Crockett in Langenderfer's murder.

To the extent Crockett claims Wright's testimony was inconsistent or could not be believed because he had a strong motive to lie, such matters were brought to the jury's attention. It was the jury's prerogative to assess the credibility of the witnesses and such will not be second-guessed by this court. The State's theory for the murder as related to the jury through several witnesses was not "implausible" as Crockett claims, but rather was a matter for the jury's consideration. *Appellant's Brief* at 18.

In one sentence, Crockett also argues that his "appellate counsel was ineffective because he failed to timely file a petition to transfer to the Indiana Supreme Court despite his communication to the Defendant that he would do so." *Appellant's Brief* at 11. Crockett has failed to support this argument with any authority or establish why such should serve as the basis for post-conviction relief.

---

have a "substantial and injurious effect."

In summary, the post-conviction court properly concluded that Crockett failed to show prejudice from appellate counsel's decision to raise ineffective assistance of trial counsel on direct appeal. More specifically, Crockett failed to show that had his claim of ineffective assistance of trial counsel been preserved for post-conviction review, he would have been entitled to relief. In light of the substantial evidence in the record, we are unconvinced that the testimony referencing Crockett's request for a "deal" during his videotaped statement or the indication that Crockett was involved in a separate criminal matter had any impact on the outcome. Because Crockett has failed to establish that trial counsel was ineffective, he cannot establish that he received ineffective assistance of appellate counsel. The post-conviction court properly denied Crockett's petition for post-conviction relief.

Judgment affirmed.

MATHIAS, J., and PYLE, J., concur.