## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 27 2016, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

George A. Foote
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

George A. Foote,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

December 27, 2016

Court of Appeals Case No.
28A01-1607-PC-1726

Appeal from the Greene Circuit Court

The Honorable Erik Allen, Judge

Trial Court Cause No.
28C01-0909-PC-141

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, George A. Foote (Foote), appeals the post-conviction court's denial of his successive petition for post-conviction relief, in which he challenged his conviction for two Counts of child molesting, Class A felonies; and two Counts of incest, one as a Class B felony and one as a Class C felony.

[2] We affirm.

## ISSUE

[3] Foote raises six issues on appeal, which we consolidate and restate as the following single issue: Whether Foote received ineffective assistance of appellate counsel.

## FACTS AND PROCEDURAL HISTORY

[4] Foote is appealing from the denial of a successive petition for post-conviction relief. We rely on the facts as set forth in our court's decision following the denial of Foote's first petition for post-conviction relief:

> Foote and his wife, Karen Foote ("Karen"), had two daughters, J.F. and B.F. J.F. was born on December 20, 1990[,] and B.F. was born on December 17, 1991. In 2004, Karen traveled to Florida to attend her mother's funeral. While Karen was away, Foote forced the girls to perform several sexual acts. He put his mouth on J.F.'s vagina, put his finger in her vagina, and put his penis in her buttocks. Foote also put his mouth on B.F.'s vagina and blew it while he masturbated into a black pipe of insulation. He also made B.F. suck on his penis.
>
> On one occasion in early March of 2007, Foote made B.F. take

off all her clothes and lie on the living room floor. He pulled down his pants, made B.F. turn onto her stomach, and put his penis on her vagina. Foote's penis penetrated B.F.'s vagina "[a] little." He rubbed it until he ejaculated, and, while doing this, told B.F. that her ass looked good. On other occasions in 2007, Foote made B.F. suck on his penis or he put his mouth on her vagina and blew it or licked it.

On March 12, 2007, J.F. and B.F. were playing outside when Foote returned from taking Karen to work. He told B.F. to go inside and told J.F. to clean herself and then come back outside. Foote and J.F. then went into Foote's utility van, which Foote had equipped with a cushion that rested on the floor, a black bench, and a curtain behind the two seats to eliminate visibility through the front windshield. Foote had also painted the other windows white to eliminate all other visibility.

Inside the van, Foote made J.F. undress and then he put his mouth on her vagina. He told J.F. that her vagina was dirty and he cleaned it with a rag and also placed his finger inside. Foote then made J.F. get on top of him. He pulled her down, put his penis in her vagina, and told J.F. to say "fuck me." Having Foote's penis inside her hurt J.F., and so she pulled off of him. Foote then made J.F. suck on his penis while he sat on the bench until he ejaculated into a tissue.

The next day at school, J.F. told her guidance counselor that her father was molesting her. Her guidance counselor notified the Assistant Principal, who then alerted the Greene County Department of Child Services (DCS). DCS representatives arrived at the school and J.F. repeated her report. B.F. was then called from class and also interviewed by DCS. She initially denied any inappropriate contact, but then eventually told DCS that she was being molested by Foote. DCS detained the

children,[1] made arrangements for foster care, and sent the girls to the emergency room for a sexual abuse examination.

After an investigation, DCS petitioned to have all three children declared Children in Need of Services (CHINS). The hearing on that petition was held on May 2, 2007. All of the children are currently placed with foster parents.

On October 1, 2007, the State charged Foote with two counts of Child Molesting, both as [Class] A felonies, and two counts of Incest, one as a [Class] C felony and another as a [Class] B felony. Foote's first jury trial ended in a mistrial due to an issue with a juror. His second jury trial started on August 18, 2008[,] and concluded on August 22, 2008. At the conclusion of the second trial, the jury found Foote guilty as charged.

*Foote*, No. 28A04-1102-PC-140, 2011 WL 6916519, at *1-2 (internal citations omitted).

[5]     Prior to sentencing, on September 29, 2008, Foote fired his court-appointed trial counsel and retained the services of David E. Schalk (Attorney Schalk). On October 31, 2008, the trial court sentenced Foote to an aggregate term of eighty years in the Indiana Department of Correction. Still represented by Attorney Schalk,

Foote initiated a direct appeal of his conviction on November 17, 2008. On March 27, 2009, he filed a motion to dismiss, which we granted on April 7, 2009. The appeal was dismissed without prejudice so that Foote could file a petition for post-conviction

---

[1] "The Footes also had a son who was also detained by DCS." *Foote v. State*, No. 28A04-1102-PC-140, 2011 WL 6916519, at *1 n.4 (Ind. Ct. App. Dec. 30, 2011), *trans. denied*; *habeas corpus denied*.

relief pursuant to the *Davis/Hatton* procedure.[2]

> Thereafter, Foote filed petitions for post-conviction relief on September 14, 2009, October 26, 2010, and November 18, 2010. A hearing on the post-conviction petitions was held on November 18, 2010. On February 3, 2011, the post-conviction court issued findings and conclusions and denied Foote's petitions for post-conviction relief.

*Id.* at \*2.

Foote—via Attorney Schalk—appealed the post-conviction court's decision, asserting that he had been denied the effective assistance of trial counsel. *See id.* Foote did not raise any issues on direct appeal. *See id.* On December 30, 2011, our court issued a memorandum decision affirming the denial of Foote's petition for post-conviction relief. *See id.* at \*1-7. We concluded that Foote's arguments regarding ineffective assistance of trial counsel largely amounted to an "attack [on] matters of trial strategy," and his remaining alleged errors "rest[ed] upon his own testimony or flimsy evidence that was ultimately

---

[2] As explained in Foote's first post-conviction relief appeal:

> The *Davis/Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. *Peaver v. State,* 937 N.E.2d 896, 897 n.1 (Ind. Ct. App. 2010), *trans. denied.* If, after a full evidentiary hearing, the post-conviction court denies the petition, the appeal can be reinstated. *Slusher v. State,* 823 N.E.2d 1219, 1222 (Ind. Ct. App. 2005). Thus, in addition to the issues initially raised in the direct appeal, the issues litigated in the post-conviction relief proceeding can also be raised. *Id.* That way, a full hearing and record on the issue will be included in the appeal. *Id.* If the post-conviction relief petition is denied after a hearing, and the direct appeal is reinstated, then the direct appeal and the appeal of the denial for post-conviction relief are consolidated. *Id.*

*Foote*, No. 28A04-1102-PC-140, 2011 WL 6916519, at \*1 n.3.

rejected by the post-conviction court" and not subject to being reweighed on appeal. *Id.* at *7.

[7] On October 15, 2015, Foote filed a successive (amended) petition for post-conviction relief, asserting that he received ineffective assistance of appellate counsel. In particular, Foote claimed that Attorney Schalk was ineffective by failing to reinstate Foote's direct appeal in order to argue that Foote was improperly sentenced and improperly labeled as a sexually violent predator. Foote also argued that Attorney Schalk was ineffective by failing to argue during the first post-conviction relief proceeding that Foote's trial counsel had been ineffective by failing to file a motion to sever Foote's offenses and failing to move to suppress DNA evidence based on chain of custody issues. Foote also alleged that Attorney Schalk was ineffective for failing to challenge a statement made by his trial counsel admitting that Foote's DNA was found in his child's underwear. Finally, Foote contended that Attorney Schalk was ineffective because during his representation of Foote, Attorney Schalk was also defending himself in an unrelated criminal matter. On January 7, 2016, and February 22, 2016, the post-conviction court conducted a hearing on Foote's petition. On July 1, 2016, the post-conviction court issued its Order, denying Foote's successive petition for post-conviction relief.

[8] Foote now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*[3]

A post-conviction proceeding provides a petitioner with the "opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal." *Maymon v. State*, 870 N.E.2d 523, 526 (Ind. Ct. App. 2007) (citing *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000), *cert. denied*, 534 U.S. 1164 (2002)), *trans. denied*. A post-conviction proceeding, however, is not "a super appeal," and it "provide[s] only a narrow remedy for subsequent collateral challenges to convictions." *Id.* (citing *Ben-Yisrayl*, 738 N.E.2d at 258). Because post-conviction proceedings are civil in nature, the petitioner bears the burden of establishing his grounds for relief by a preponderance of the evidence. *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002), *cert. denied*, 540 U.S. 830 (2003); *see* Ind. Post-Conviction Rule 1(5).

When appealing the denial of a petition for post-conviction relief, "the petitioner stands in the position of one appealing from a negative judgment." *Willoughby v. State*, 792 N.E.2d 560, 562 (Ind. Ct. App. 2003), *trans. denied*. Our court does not reweigh the evidence or judge the credibility of witnesses. *Id.*

> In order to prevail, the petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a

---

[3] We note that Foote's appellate brief includes citations to the transcript/record of both the trial and his first post-conviction proceeding. During the hearing on his second petition for post-conviction relief, the post-conviction court took judicial notice of the records relating to Foote's prior proceedings. In fact, the trial court indicated that it would "enter into evidence for the proceedings the transcripts of the trial." (Tr. p. 6). However, none of these documents have been transmitted to our court.

conclusion opposite that reached by the post-conviction court. It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law.

*Id.* (internal citation and quotation marks omitted). We will review the post-conviction court's factual findings for clear error, but we owe no deference to its conclusions of law. *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013).

## II. *Ineffectiveness of Appellate Counsel*

Foote claims that he received ineffective assistance of appellate counsel. The Sixth Amendment to the United States Constitution "entitles a criminal defendant to the effective assistance of counsel not only at trial, but during his first appeal as of right." *Ben-Yisrayl*, 738 N.E.2d at 260. We review claims of ineffective assistance of appellate counsel according to the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), *reh'g denied*. First, the petitioner must "establish that his counsel's performance was deficient. This requires a showing that his counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of [the petitioner's] Sixth Amendment right to counsel." *Dawson v. State*, 810 N.E.2d 1165, 1173 (Ind. Ct. App. 2004) (internal citation omitted), *trans. denied*. Second, the petitioner "must demonstrate that the deficient performance prejudiced his defense. In order to establish prejudice, [the petitioner] must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal citations omitted).

[12] On review, we are mindful that counsel has considerable discretion in choosing strategy and tactics, and we accord those decisions deference. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001). In fact, there is a strong presumption "that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Dawson*, 810 N.E.2d at 1173 (quoting *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001)). "Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective." *Timberlake*, 753 N.E.2d at 603. With respect to appellate counsel, our supreme court has recognized three categories of ineffective assistance claims: "(1) denying access to an appeal; (2) failing to raise issues; and (3) failing to present issues competently." *Dawson*, 810 N.E.2d at 1173 (citing *Timberlake*, 753 N.E.2d at 604).

[13] Here, Foote primarily relies on the second category of appellate counsel ineffectiveness—failing to raise issues. "Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal." *Reed v. State*, 856 N.E.2d 1189, 1196 (Ind. 2006). Based on our longstanding deferential approach to appellate counsels' strategic decisions to raise certain issues on appeal, in order to show that his counsel's performance was deficient, Foote "must show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be

explained by any reasonable strategy." *Timberlake*, 753 N.E.2d at 606 (quoting *Ben-Yisrayl*, 738 N.E.2d at 260-61). We emphasize that a claim of ineffective assistance of counsel will be rejected if the petitioner fails to establish either deficient performance or prejudice. *McCullough v. State*, 987 N.E.2d 1173, 1176 (Ind. Ct. App. 2013). Thus, if we are able to "dismiss an ineffective assistance claim on the prejudice prong, we need not address whether counsel's performance was deficient." *Id.* (quoting *Lee v. State*, 892 N.E.2d 1231, 1233 (Ind. 2008)).

### A. *Failure to Raise Issues on Direct Appeal*

Foote first contends that Attorney Schalk was ineffective because, after moving to dismiss Foote's direct appeal in favor of pursuing additional evidence through the *Davis/Hatton* procedure, Attorney Schalk failed to reinstate Foote's direct appeal. Instead, only issues pertaining to the denial of Foote's first petition for post-conviction relief were raised on appeal. Foote now argues that Attorney Schalk should have challenged the propriety of Foote's sentence on direct appeal.

In his successive petition for post-conviction relief, Foote asserted that the trial court "erroneously aggravated beyond the presumptive [sentence]" the two Counts of Class A felony child molesting, which, according to Foote, were "charged as occurring in 2004." (Appellant's App. p. 38). For each of these Counts, the trial court imposed a forty-year sentence, to be served consecutively. At the time these crimes were committed, Indiana Code section 35-50-2-4 (2004) provided that "[a] person who commits a Class A felony shall

be imprisoned for a fixed term of thirty (30) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances." If a trial court "deviated from the fixed term presumptive sentence, it was required to '(1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance ha[d] been determined to be mitigating or aggravating; and (3) articulate the court's evaluation and balancing of circumstances.'" *Anglemyer v. State*, 868 N.E.2d 482, 486 (alteration in original) (quoting *Prickett v. State*, 856 N.E.2d 1203, 1207 (Ind. 2006)), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

[16] In 2000 and then again in 2004, the United States Supreme Court stipulated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) & *Blakely v. Washington*, 542 U.S. 296, 301 (2004), *reh'g denied*). In response to *Blakely*, our supreme court determined "that Indiana's fixed term sentencing scheme" was unconstitutional "because 'it mandates *both* a fixed term and permits judicial discretion in finding aggravating or mitigating circumstances to deviate from the fixed term.'" *Id.* at 487 (quoting *Smylie v. State*, 823 N.E.2d 679, 685 (Ind. 2005)). "To remedy the constitutional infirmity," the *Smylie* court determined

that "a jury must find the facts used to enhance a fixed presumptive term." *Id.*[4] In his petition for post-conviction relief, Foote argued that the seven aggravating circumstances identified by the trial court at the time of sentencing ran afoul of *Blakely* as they were not found by a jury to have been proven beyond a reasonable doubt. Foote also insisted that the trial court improperly accorded minimal weight to the two mitigating circumstances that it identified. Thus, Foote's position in his post-conviction relief petition was that Attorney Schalk was ineffective in failing to challenge these errors on direct appeal.

[17] Between the commission of Foote's crimes in 2004 and his sentencing in 2008, Indiana's sentencing statutes were amended. Nevertheless, the post-conviction court determined that the trial court had properly sentenced Foote because two of its aggravating circumstances were, in fact, found by the jury: that Foote violated a position of trust by molesting his biological daughters and that there were multiple victims. On appeal, Foote now appears to concede that these aggravating circumstances were found by the jury; however, he argues that the trial court erroneously relied on the position of trust as an aggravating circumstance:

---

[4] A few weeks after the Indiana Supreme Court issued its *Smylie* decision, the Indiana General Assembly amended Indiana's sentencing statutes. *See Anglemyer*, 868 N.E.2d at 487. The General Assembly "left intact lower and upper limits for each class of felony offenses, but eliminated fixed presumptive terms in favor of 'advisory sentences' that are between the minimum and maximum terms. In addition, the Legislature eliminated the requirement that trial courts must consider certain mandatory circumstances when determining the exact sentence to be imposed. Rather, the amended statute now includes a non-exhaustive list of aggravating and mitigating circumstances trial courts 'may consider.'" *Id.* (internal citation omitted) (quoting Ind. Code § 35-38-1-7.1(a)-(b)).

> Since Foote was also found guilty of two incest counts, being biologically related was found by the jury. When the court made its findings that Foote violated *that* position, they also concluded it to be found that Foote was biologically related. If incest is a Class B felony, then how can a finding of child molest[ing] by incest create a [forty-]year offense? It is illogical and unreasonable. Furthermore, legislators created a class of persons who receive less punishment for the same offense as those who commit the offense when not related.

(Appellant's Br. p. 20). As to the trial court's identification of multiple victims as an aggravating circumstance, Foote does not challenge that this is a valid aggravator or that it was found to be proven by the jury. Rather, he insists that the trial court should have accorded more weight to the mitigating circumstances—namely, his lack of a criminal history.

[18] We find no merit in Foote's largely-incoherent claim, and we further find that he has failed to establish that he was prejudiced by Attorney Schalk's failure to raise sentencing issues on direct appeal. Foote was convicted of two Counts of child molesting as Class A felonies for acts committed in 2004 and two Counts of incest, one as a Class B felony and one as a Class C felony, for acts committed in 2007. Foote's *Blakely* argument applies only to the sentences for the offenses committed prior to 2005 (*i.e.*, prior to when Indiana's sentencing statutes were amended). While the trial court identified seven aggravating circumstances, the post-conviction court distinguished two factors that were found by a jury in order to support aggravating Foote's sentences for Class A felony child molesting. It is well established that "[a]busing a 'position of trust' is, by itself, a valid aggravator which supports the maximum enhancement of a

sentence for child molesting." *Singer v. State*, 674 N.E.2d 11, 14 (Ind. Ct. App. 1996). Based on the fact that it found Foote guilty of incest, the jury clearly found that Foote was the biological father of the children that he molested. *See* I.C. § 35-46-1-3 (2007) (defining the crime of incest). "There is no greater position of trust than that of a parent to his own young child." *Hart v. State*, 829 N.E.2d 541, 544 (Ind. Ct. App. 2005). Accordingly, the trial court's identification of position of trust as a valid aggravating circumstance did not run afoul of *Blakely*.

[19] Moreover, a "trial court is not obligated to find the existence of mitigating circumstances, nor is it required to give the same credit as the defendant does to the defendant's proffered mitigating circumstances." *Singer*, 674 N.E.2d at 14. Here, the trial court considered that Foote had no prior criminal history but determined that it was outweighed by the aggravating factors. This was well within the trial court's discretion. *Id.* at 18. Therefore, because Foote has failed to establish that he would have prevailed on direct appeal if Attorney Schalk had raised certain sentencing issues, his claim of ineffectiveness must fail.

### B. *Failure to Raise Issues Regarding Trial Counsel's Ineffectiveness*

[20] Foote next contends that Attorney Schalk was ineffective by failing to raise specific instances of trial counsel ineffectiveness.

> When the claim of ineffective assistance is directed at appellate counsel for failing fully and properly to raise and support a claim of ineffective assistance of trial counsel, a defendant faces a compound burden on postconviction. The postconviction court must conclude that appellate counsel's performance was deficient

and that, but for the deficiency of appellate counsel, trial counsel's performance would have been found deficient and prejudicial.

*Timberlake*, 753 N.E.2d at 604. In other words, Foote bears the burden of establishing "the two elements of ineffective assistance of counsel separately as to both trial and appellate counsel." *Id.* (citing *Ben-Yisrayl*, 738 N.E.2d at 261-62).

In Foote's first post-conviction relief proceeding, Attorney Schalk unsuccessfully argued that Foote's trial counsel had rendered ineffective assistance based on trial counsel's purported failure "to impeach J.F. and B.F. at trial with their CHINS testimonies;" to "call certain witnesses at trial;" and to "address other problems or advance other defenses that Foote claims to have discussed with him." *Foote*, No. 28A04-1102-PC-140, 2011 WL 6916519, at *2. Foote now argues that Attorney Schalk was ineffective because he failed to include in his trial counsel ineffectiveness claim that trial counsel should have moved for severance of the charges and should have challenged the State's DNA evidence. We address each in turn.

### 1. *Severance of Offenses*

Although it is not entirely clear, Foote appears to assert that his trial counsel should have moved to sever the child molesting charges from the incest charges and that Attorney Schalk was deficient in failing to argue that trial counsel was ineffective for not doing so. Indiana Code section 35-34-1-9(a) provides that

> [t]wo (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:
> (1) are of the same or similar character, even if not part of a single scheme or plan; or
> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

However,

> [w]henever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses. In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
> (1) the number of offenses charged;
> (2) the complexity of the evidence to be offered; and
> (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

I.C. § 35-34-1-11(a).

[23] In this case, Foote asserts ineffectiveness of counsel simply based on his belief that he was entitled to severance as a matter of right. Notwithstanding whether Foote would, in fact, have been entitled to severance of his offenses if such a motion had been made, Foote has presented *no* argument that he was prejudiced by the fact that his four charges were tried together. Therefore,

Foote has failed to satisfy his burden in order to establish ineffective assistance of appellate counsel on this basis.

## 2. *DNA Evidence*

[24] Foote also asserts that Attorney Schalk was ineffective in failing to identify trial counsel's errors with respect to the State's DNA evidence. During the trial, the State presented evidence indicating that Foote's DNA was present in mixtures found in a pair of underwear belonging to J.F., as well as in a tissue (in which Foote had purportedly ejaculated) and from a hair (which was found in the tissue). According to the DNA analyst, the likelihood that the DNA found in the underwear came from Foote was 1 in 580 million; the likelihood that the DNA in the tissue came from Foote was 1 in 4.7 million; and the likelihood that the DNA from the hair came from Foote was 1 in 16 million. Because a statistical frequency of 1 in 6 trillion was required in order to conclude that the DNA "match[ed]" that taken from Foote for comparison, the DNA analyst interpreted the results as being unable to exclude Foote as the source of the DNA. (Tr. p. 25). The DNA analyst explained that the DNA was extracted from mixtures of DNA of which Foote was not the major contributor (*i.e.*, J.F.'s DNA was the major profile), and the amount of DNA did not allow the analyst "to separate both of those profiles into their constituent parts." (Tr. p. 30). The DNA analyst further testified at the post-conviction hearing that "[t]t is not inconclusive. It is not a match. It is in between there. If it was inconclusive, there would be no statistic for it." (Tr. p. 36). Although we were not presented with the trial transcript in order to know how the DNA analyst

actually testified during the trial, she stated at the post-conviction hearing that she would not have told the jury that it was conclusively Foote's DNA; rather, she would have stated the statistical frequencies and "that you could not exclude [Foote's] standard as being a contributor to that mixture." (Tr. p. 30).

[25] According to Foote, his trial counsel improperly conceded during trial that the DNA belonged to Foote, and despite the trial court's instruction that trial counsel's statements are not to be considered as evidence, such a concession was tantamount to "conceding to the charge itself." (Appellant's Br. p. 27). We cannot agree that such a statement by trial counsel prejudiced the outcome of Foote's case in light of the fact that the jury was presented with evidence indicating a strong statistical likelihood that Foote deposited the incriminating DNA. Furthermore, Foote testified to his innocence during the trial, and it was within the discretion of the jury to discredit his testimony. During the post-conviction hearing, Foote's trial counsel testified that he believed the State's evidence identified Foote's DNA and further noted that Foote had admitted to ownership of the DNA. Thus, as a matter of trial strategy, Foote's trial counsel intended to have Foote testify as to an innocent explanation for how his DNA was discovered in certain places. As it is not the role of this court to second-guess the strategies employed by defense counsel—and based on Foote's failure to establish prejudice—we cannot say that trial counsel offered ineffective assistance on this basis. *See Timberlake*, 753 N.E.2d at 603. Without establishing the ineffectiveness of trial counsel, Foote's claim of ineffective assistance of appellate counsel must also fail.

[26] Regarding the DNA evidence, Foote also argues that Attorney Schalk was ineffective by overlooking the trial court's failure to challenge the chain of custody. "An adequate foundation establishing a continuous chain of custody is established if the State accounts for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial." *Espinoza v. State*, 859 N.E.2d 375, 382 (Ind. Ct. App. 2006). The State is not required to

> establish a perfect chain of custody, and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties. To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with.

*Id.* (internal citations omitted).

[27] Foote directs our attention to a "Dissemination Record (Telephone)" from the crime lab, in which the serologist who processed the DNA evidence indicated that she contacted one of the investigators to inquire "if she knew where the unmarked swabs in item 9 had been collected from. [The investigator] said that she was present for the collection of the swabs and that they were oral swabs from George Foote." (Appellant's Exh. 2). Foote asserts that the fact that the unmarked swabs did not identify him as the source of the DNA samples renders the DNA kit unreliable. However, the serologist clarified during the post-conviction hearing that she did not call the investigator to inquire "about who

[the swabs] were collected from. I was calling about what type of swabs they probably were." (Tr. p. 49). Whether the swabs are from the oral cavity or another area of the body determines how the DNA evidence is processed, and, here, the investigator confirmed that Foote had provided oral swabs for testing. The serologist further stated that the swabs were contained in a box which was labeled with Foote's name. Foote's assertion on appeal that the evidence clearly did not remain in an undisturbed location because his name was "later placed on the kit in order to present it [a]t trial as evidence" has absolutely no basis in the record. (Appellant's Br. p. 29).

[28] Foote additionally challenges the chain of custody based on his belief that the detective who collected the evidence

> did not demonstrate he performed his job with regularity and due care when he took home evidence that was not fully labeled, failed to refrigerate the suspect kit, used an expired kit and failed to follow the instructions when doing so, failed to include a vital piece of information, and failed to include the name of the witness on the kit that claims to have been present for the collection.

(Appellant's Br. p. 29). The evidence establishes that, after collecting the DNA evidence from Foote, the detective packaged it, placed it in his patrol car, and released it to another investigator the following morning. The detective testified that it is common practice to take evidence home because it remains in his possession, locked in his patrol car for which he has the only set of keys. During the post-conviction hearing, Attorney Schalk testified that he would not

have raised a chain of custody issue based on the fact that the detective took the evidence home if the detective "could vouch for it being in his possession until he turned it over to the next person who signed for it." (Tr. p. 97). We likewise find no merit in Foote's chain of custody claim as there is no evidence of any gap in the possession of the evidence. *See Donahoo v. State*, 640 N.E.2d 702, 703-04 (Ind. 1994) (finding sufficient chain of custody where evidence was stored in locked vehicles).

[29] As previously mentioned, there is no support in the record for the assertion that the evidence kit was improperly labeled. Moreover, with respect to refrigeration of the evidence, expiration of the kit, or non-conformance with the kit's instructions, Foote did not address these issues in his petition for post-conviction relief and he did not ask any questions relating to these matters during the post-conviction hearing; therefore, they are waived. *See Stevens*, 770 N.E.2d at 746 ("[A]ny '[i]ssues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.'" (second alteration in original) (quoting *Allen v. State*, 749 N.E.2d 1158, 1171 (Ind. 2001))). Accordingly, Foote has failed to establish that Attorney Schalk's performance was deficient—let alone prejudicial—based on the fact that he did not raise ineffective assistance of trial counsel arguments concerning the chain of custody.

### C. *Appellate Counsel's Simultaneous Self-Representation*

[30] Finally, Foote claims that Attorney Schalk provided ineffective assistance of counsel because, during his representation of Foote, Attorney Schalk was also

involved in his own criminal proceedings. Although he was initially represented by counsel, at times during the pendency of his case, Attorney Schalk acted *pro se*. On November 17, 2009, following a bench trial, Attorney Schalk was convicted of attempted possession of marijuana as a Class A misdemeanor. On February 28, 2011, our court affirmed his conviction. *See Schalk v. State*, 943 N.E.2d 427 (Ind. Ct. App. 2011), *trans. denied*. The Indiana Supreme Court subsequently suspended Attorney Schalk from the practice of law "for a period of not less than nine months, without automatic reinstatement, beginning May 24, 2013." *In re Schalk*, 985 N.E.2d 1092, 1093 (Ind. 2013) (Mem).

[31] Foote admits that he "has no authority that demands that his counsel may not defend himself and a client concurrently." (Appellant's Br. p. 30). Nonetheless, "Foote would show that [Attorney Schalk] was not acting in his best interest when he allowed Foote to retain him in a major felony case while counsel was also acting in a self-preservation mode." (Appellant's Br. p. 30). Except to suggest that Attorney Schalk's failure to reinstate Foote's direct appeal was the result of being distracted with his own case—as opposed to being a matter of strategy as Attorney Schalk testified during the post-conviction hearing—Foote has not offered any argument that Attorney Schalk's self-representation in his own marijuana case negatively impacted his representation of Foote. Furthermore, the only evidence presented on this issue was the testimony of Attorney Schalk, who stated during the post-conviction hearing that he did not neglect Foote's case in favor of his own because "there

wasn't much to do in [Attorney Schalk's case]" as "[a]ll the facts were totally on the table and the question was [whether it was] legal or not and I had my reasons why I thought it was and nobody could actually say why it wasn't. They just didn't like it." (Tr. p. 110). Thus, Foote has not demonstrated that he received ineffective assistance of appellate counsel.[5]

## CONCLUSION

[32] Based on the foregoing, we conclude that Foote did not receive ineffective assistance of appellate counsel.

[33] Affirmed.

[34] Crone, J. and Altice, J. concur

---

[5] Foote additionally claims that his two convictions for Class A felony child molesting are unconstitutional because the General Assembly "never intended to punish those who offend within the family as severely as those who offend against a child outside the family and become dangerous to all of society and not just to their own family." (Appellant's Br. p. 35). However, Foote did not raise this issue in his petition for post-conviction relief and, therefore, has waived the matter for appeal. *See Stevens*, 770 N.E.2d at 746. Waiver notwithstanding, Foote implores our court to address this issue on the merits. As noted above, this appeal stems from a successive petition for post-conviction relief. Despite ample opportunity to raise this alleged issue in either of his post-conviction relief petitions, Foote has waited until this appeal. Therefore, we decline his request and find his argument waived.