## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2020, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Gentry H. Jackson
Bunker Hill, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Caryn N. Szyper
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gentry H. Jackson, *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, *Appellee-Respondent.* | July 30, 2020 <br><br> Court of Appeals Case No. 19A-PC-1249 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> The Honorable Kathleen A. Sullivan, Magistrate <br><br> Trial Court Cause No. 45G01-1711-PC-8 |

**Mathias, Judge.**

[1] Gentry H. Jackson ("Jackson") was convicted in Lake Superior Court of murder. Following an unsuccessful direct appeal, Jackson filed a petition for post-conviction relief. The post-conviction court denied Jackson's petition, and Jackson appeals, claiming that the post-conviction court clearly erred in determining that he was not denied the effective assistance of trial counsel.

[2] We affirm.

## Facts and Procedural History

[3] In Jackson's direct appeal, we set forth the facts underlying his conviction as follows:

> Jackson is married to Michelle Jackson. Previously, Michelle was married to Alec McCloud for eight to nine years and had five children with him. Two of those children were Justin McCloud and Alexis McCloud Rogers; Justin was twenty-two at the time of trial, and Alexis was nineteen. Michelle asserted that Alec had been abusive towards her during their marriage, and Alec and Jackson had a very antagonistic relationship. Alec was not welcome at Jackson's residence.
>
> On August 3, 2015, Alexis was living with Jackson and Michelle in Gary. Justin also was at the house that day. At some point on that day, before the sun went down, Alexis returned to the house from an outing and had to knock on the door because she did not have a key. As she was knocking, she saw Alec drive up to the house in his mother's car. Alexis had not spoken to Alec for months and was surprised to see him. Justin opened the door for Alexis and also saw Alec parked outside; he had spoken to Alec earlier and was aware he was in town.
>
> Alexis got into an argument with Michelle after going into the house and mentioning to Justin that their father was outside.

Justin went outside while Alexis and Michelle continued arguing. When Michelle noticed that Alec was outside, she yelled at Alexis, "why did [you] bring him over here." Alexis noticed Jackson go into his bedroom, come back out carrying a gun, and go outside. As Jackson walked past Michelle, she said, "make sure that's him." Justin could see that Alec was on his phone, sitting in the car, when Jackson approached the car and said, "I got you now." Justin did not see anything else in Alec's hands besides his cell phone. Jackson then began shooting at the car and eventually fired a total of eight shots. Alec began driving away as Jackson opened fire.

Alec drove for a short distance before wrecking the car. Justin and a friend of his arrived on the scene shortly thereafter. Justin and his friend saw Alec's phone in his lap and nothing else, such as a gun. Police never recovered a gun from Alec or the car. There were five bullet holes in the driver's side front door and one in the rear door. Alec suffered gunshot wounds to his back, abdomen, and buttocks. After undergoing emergency surgery, Alec died.

After the shooting, Jackson took the chamber out of the gun, called 911, reported the shooting, and waited for police to arrive. While waiting, Michelle told Alexis, "Look what you made my husband do. My husband better not go to jail." When police arrived, Jackson told them he had shot Alec because he had seen Alec point a gun at him.

In Alexis's first statement to police immediately after the shooting, she said that Alec had called Jackson to the car and that she saw Alec holding a gun. She also said Alec may have shot first. Alexis also made similar statements to defense counsel. However, at the end of December 2015, Alexis went to the police station with Alec's mother and said she had lied in her earlier statements, and that in fact from where she was standing she could not see if Alec was holding anything in his hands. Alexis explained that she felt pressured to lie because of Michelle's perceived threat to her that Jackson "better not go to jail."

*Jackson v. State*, No. 45A03-1609-CR-2032, 2017 WL 2628444 at \*1–2 (Ind. Ct. App. June 19, 2017), (record citations omitted) *trans. denied*.

[4]     The State charged Jackson with murder. Jackson filed a pre-trial motion in limine to prevent the State from presenting evidence that Michelle had threatened Alexis that Jackson had "better not go to jail." The trial court initially granted the motion but later reversed itself and allowed the admission of the statement. During the direct examination of Alexis at trial, the State presented evidence of Michelle's statement in order to explain why Alexis's initial statements (that she saw Alec with a gun) differed from her later statements and from her trial testimony (that she did not see Alec holding a gun). The trial court allowed Alexis to testify as to Michelle's statement, but instructed the jury that it was to consider Alexis's testimony regarding what Michelle told her only to show Alexis's state of mind at the time, not to prove the truth of the matter asserted by Michelle.

[5]     Jackson testified on his own behalf at trial, claiming that Alec asked him to approach the car, and as he did so, that Alec raised a gun and pointed it at him. Jackson claimed he then pulled his gun out of his waistband and began firing it at the car, not really aiming at Alec, as he ran backwards and attempted to take shelter behind his own car. The jury rejected Jackson's claim of self-defense and found Jackson guilty as charged.

[6]     On direct appeal, Jackson presented three issues: (1) whether the trial court abused its discretion by permitting the State to present evidence of Michelle's

statement to Alexis; (2) whether there was sufficient evidence of Jackson's mens rea to support his conviction for murder; and (3) whether there was sufficient evidence to rebut Jackson's claim of self-defense. *Jackson*, 2017 WL 2628444 at *1. We rejected these claims, concluding that the admission of the statement was not unduly prejudicial, that the evidence was sufficient to support Jackson's murder conviction, and that there was sufficient evidence to rebut Jackson's claim of self-defense. *Id.* at *4–5. Our supreme court denied Jackson's petition to transfer. *Jackson v. State*, 92 N.E.3d 1090 (Ind. 2017) (table).

[7] On November 29, 2017, Jackson filed a pro se petition for post-conviction relief. Jackson filed an amended petition, by counsel, on September 14, 2018. The post-conviction court held an evidentiary hearing on Jackson's petition on November 14, 2018, and on May 7, 2019, the post-conviction court entered findings of fact and conclusions of law denying Jackson's petition. Jackson now appeals.

## Post-Conviction Standard of Review

[8] We have repeatedly explained that post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *McCary v. State*, 761 N.E.2d 389, 391 (Ind. 2002). Post-conviction proceedings instead afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Davidson v. State*, 763 N.E.2d 441, 443 (Ind. 2002). The post-conviction petitioner bears the burden of establishing grounds for relief by a preponderance of the

evidence. *Henley v. State*, 881 N.E.2d 639, 643 (Ind. 2008). Thus, on appeal from the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id.* To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence, as a whole, leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 643–44.

The post-conviction court made specific findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). On review, we must determine if the court's findings are sufficient to support its judgment. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962. Although we do not defer to the post-conviction court's legal conclusions, we review the post-conviction court's factual findings for clear error. *Id.* Accordingly, we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id.*

## Ineffective Assistance of Trial Counsel

Jackson claims that the post-conviction court erred in rejecting his claim that his trial counsel was ineffective. Our supreme court has summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the

defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the Strickland test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

*Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

## Discussion and Decision

Jackson argues that his trial counsel was constitutionally ineffective by failing to depose certain witnesses and failing to obtain certified records of the victim's criminal history. We address each in turn.

## A. Failure to Depose Hospital Personnel

Jackson first claims that his trial counsel's performance was deficient because he did not depose or otherwise interview the medical personnel who treated Alec after the shooting. At trial, the coroner's report indicated that, at the time of his death, Alec had amphetamines and cannabinoids in his system. *See* Trial Ex. Vol. pp. 111, 117.[1] In his closing argument, Jackson's trial counsel argued that Alec was the aggressor and that his "perception of events was clouded with methamphetamine and marijuana in his system." Trial Tr. Vol. 3, p. 126. With regard to the drug's in Alec's system, the State countered in its rebuttal that:

> We know there was marijuana in Mr. McCloud's system and -- okay. Methamphetamines, I have no idea. I mean but let's not sit here and speculate that he was out smoking meth. Methamphetamine in your system can come from a number of things. It can come from prescription medicine. He was just at the hospital treated for an hour while they tried to save his life. I have no idea how it happened. I have no idea how it got there and you should not speculate.

*Id*. at 127–28.

Jackson now claims that his trial counsel should have asked the hospital staff regarding the source of the methamphetamine that was found in Alec's blood at the time of his death and then presented their testimony at trial. Jackson specifically notes that Dr. Reuben Rutland, the head of trauma surgery at

---

[1] We refer to the pages in the PDF document, not the exhibits themselves.

Methodist Hospital where Alec was treated, testified at the post-conviction hearing that emergency room personnel did not give Alec marijuana, methamphetamine or any drug that would be metabolized into methamphetamine. Jackson claims that, had such evidence been presented at trial, it would have undermined the State's claim in closing argument that there was an innocent explanation for the drugs in Alec's system.

[14] Jackson, however, failed to establish that any of the medical staff would have been permitted to testify regarding the source of the drugs in Alec's system. Dr. Rutland testified that Alec's treatment in the emergency room was not the source of the positive drug tests. Dr. Rutland also testified that he was unaware if several medications, including Wellbutrin, Prozac, Sudafed, and Ibuprofen, could result in a false positive for methamphetamine or marijuana. Dr. Rutland responded that such questions were better directed to a pharmacist or pharmacologist, not an emergency room surgeon. Jackson did not present any evidence as to what any other hospital staff would have testified to. Under these facts and circumstances, we cannot say that the failure to depose Dr. Rutland, or other hospital staff, constituted deficient performance. Dr. Rutland merely testified that Alec was not given marijuana or methamphetamine in the emergency room, which is not a surprising admission. He was unable to testify as to the source of the drugs found in Alec's system,[2] and Jackson did not

---

[2] Moreover, even if trial counsel had presented such evidence, it was unlikely that this would have altered the outcome of the trial. The jury was made aware of the drugs in Alec's system, and further speculation

present any other evidence that any other hospital personnel would have been able to testify as to the source of the drugs in Alec's system.

## B. Failure to Depose Alexis McCloud Rogers

Jackson next contends that his trial counsel's performance was deficient because counsel did not depose Alexis McCloud Rogers ("Alexis"), the daughter of the victim, Alec, and Jacksons' wife, Michelle. As noted in our opinion in Jackson's direct appeal, Alexis initially told the police that Alec had called Jackson to the car, that she saw Alec holding a gun, and that Alec may have fired the first shot. Alexis gave a similar account of the events of the shooting to Jackson's trial counsel. After she made these statements, but before trial, Alexis recanted her earlier statement, informing the police that she could not see whether Alec had a gun and that she felt pressured to lie because her mother Michelle had said to her, "Look what you made my husband do. My husband better not go to jail." Trial Tr. Vol. I, p. 157. Jackson's trial counsel used Alexis's initial statements to impeach her at trial, when she testified that she did not see Alec holding a gun and felt pressured to lie because of the perceived threat from her mother.

Jackson acknowledges that his trial counsel impeached Alexis with her prior statements. However, he argues that his trial counsel should have deposed Alexis because, he claims, a prior sworn statement such as deposition testimony

___

regarding the source of these drugs would have been unlikely to convince the jury that his use of drugs made him the aggressor in the shooting.

would have been admissible as substantive evidence instead of merely impeachment evidence. *See Gray v. State*, 982 N.E.2d 434, 437 n.1 (Ind. Ct. App. 2013) (noting that a prior inconsistent statement may be admissible as substantive evidence if the declarant testifies at trial, is subject to cross-examination, and the statement was given under oath subject to the penalty of perjury at a trial, hearing, or deposition) (citing Ind. Evidence Rule 801(d)(1)); *Stoltmann v. State*, 793 N.E.2d 275, 281 (Ind. Ct. App. 2003) ("a witness's prior inconsistent unsworn statement is not admissible as substantive evidence."), *trans. denied*.

[17] The problem with Jackson's argument is that he failed to establish what Alexis would have testified to had she been deposed. He did not call her as a witness at the post-conviction hearing. Maybe Alexis would have testified at a deposition in a manner consistent with her original statement implicating Alec. But it is also possible that she would have testified in a manner consistent with her trial testimony implicating Jackson. For this reason, we agree with the post-conviction court that Jackson did not prove that his trial counsel's performance fell below an objective standard of reasonableness for his failure to depose Alexis.

### C. Failure to Depose Justin McCloud and Trent Hester

[18] Jackson next argues that his counsel's performance was deficient because he failed to depose Alec's son, Justin McCloud ("Justin"), and Justin's friend Trent Hester ("Hester"). Both of these individuals arrived on the scene shortly

after the shooting and testified that they saw nothing in Alec's possession other than a cell phone on his lap.

[19] Jackson claims that Justin and Hester testified at trial that they went to the scene where Alec's car had crashed and removed some items from the car before the police arrived. At trial, Justin testified that Hester took Alec's cell phone and wallet. Hester testified that he took the cell phone and gave it to the police but that he never took the wallet. They both testified that the bag at the scene of the crash was a bag containing Justin's clothes. Jackson claims that Justin and Hester had the opportunity to remove any gun that Alec might have had before the police arrived. Yet again, however, Jackson did not call either Justin or Hester as a witness at the post-conviction hearing. Therefore, it is unknown how they would have testified at a pre-trial deposition. It is also unlikely that they would have testified that they removed a gun from the car given that their trial testimony was that they did not see a gun in Alec's possession.[3]

[20] Jackson also claims that, had Justin been deposed prior to trial, it would have been possible, through a reconstruction of the scene, to determine whether Justin could have been able to see from his vantage point whether Alec had a gun. In addition to being entirely speculative, Justin testified at trial that he rushed to the scene of his father's crashed car and looked inside the car. It is

---

[3] Even if they lied about the gun, which is Jackson's contention, it is unlikely that a deposition would have made them alter their testimony.

clear from his testimony that he would have been able to see whether Alec was in possession of a weapon. Yet all he saw was a cell phone in Alec's lap.

[21] Jackson also claims that Justin's and Hester's testimony regarding what happened when they went to the scene of Alec's crashed car differed considerably from their testimony at the pre-trial habeas corpus hearing. Jackson, however, has not provided us with a copy of the transcript of the testimony presented at the habeas hearing. We are therefore unable to determine any inconsistency between their testimony at trial and at the habeas hearing. We note, however, that Jackson's trial counsel did attempt to impeach Justin's testimony by noting some inconsistency between his testimony at the pre-trial habeas hearing and his trial testimony. *See* Trial Tr. Vol. I, pp. 94–98 (trial counsel noting the inconsistency in Justin's testimony regarding whether his father came to pick him up). Still, Jackson contends that, had his trial counsel deposed Justin and Hester, there may have been additional inconsistencies in their depositions that may have allowed his trial counsel to further impeach Justin's credibility. This is sheer speculation. In light of the fact that Jackson's trial counsel testified at the post-conviction hearing that he chose not to depose the witnesses before trial as a matter of strategy—so as not to memorialize testimony and so that his trial strategy would not be revealed to the prosecution—we cannot say that the choice not to depose Justin and Hester constituted deficient performance.

*D. Failure to Obtain Certified Records of Alec's Criminal History*

[22] Jackson also faults his trial counsel for failing to obtain certified copies of Alec's criminal history. Evidence of a person's character is generally inadmissible to prove action in conformity therewith on a particular occasion. Ind. Evidence Rule 404(a). Evidence Rule 404(a)(2), however, "provides an exception to the rule against introducing evidence to imply that a person acted in conformity with character on a particular occasion." *Brand v. State,* 766 N.E.2d 772, 779 (Ind. Ct. App. 2002), *trans. denied*. Yet, Rule 404(a)(2) "does not contemplate that character evidence will offer a glimpse into a defendant's mind at the time he acted in self-defense. This proposition sought to be proved by the defense is different than the one espoused in Rule 404(a)(2)." *Id.* Instead:

> Introduction of specific acts to prove the defendant's state of mind would support the proposition that the defendant had a reasonable belief that deadly force was necessary. In contrast, introduction of specific acts as victim character evidence, as permitted by Rule 404(a)(2), would support the proposition that the victim was using unlawful force. These are two separate and distinct propositions, and in fact constitute separate elements of self-defense. Moreover, because the general exclusionary rule of Evidence Rule 404(a) applies only when character evidence is used for the purpose of proving action in conformity with [] character, *it is apparent that when character evidence is utilized for some other purpose, such as to show defendant's state of mind, the rule is inapplicable. See* Evid. R. 404(a).

*Id.* (emphasis added)

[23] "[T]he victim's reputed character, propensity for violence, prior threats and acts, *if known by the defendant*, may be relevant to the issue of whether a defendant had fear of the victim prior to utilizing deadly force against him." *Id.* (emphasis added). "[A]lthough a victim's threats or violence need not be directed toward the defendant, 'the defendant must have knowledge of these matters at the time of the . . . confrontation between the victim and the defendant.'" *Welch v. State*, 828 N.E.2d 433, 437 (Ind. Ct. App. 2005) (citing *Holder v. State*, 571 N.E.2d 1250, 1254 (Ind. 1991); *Feliciano v. State*, 477 N.E.2d 86, 88 (Ind. 1985)).

[24] In the present case, Jackson claims that the admission of Alec's criminal records would have bolstered his claim of self-defense. There are several problems with Jackson's argument. First, he did not introduce a copy of Alec's criminal history into evidence at the post-conviction hearing. We are therefore unable to determine the nature and extent of Alec's criminal history and how his criminal history might have been relevant to show Jackson's state of mind. Also, Jackson does not explain to what extent he knew of Alec's criminal record. Alec's criminal record could not have been relevant to Jackson's state of mind if, at the time of the shooting, Jackson was unaware of Alec's criminal record.

[25] Still, our review of the transcript of Jackson's trial does show that, several months prior to the shooting, Jackson received a report from a trial court in California that involved an investigation of Alec with regard to his children. This report, which was admitted at trial as Defendant's Exhibit 9, indicated that

Alec "ha[d] a history of illicit drug use and is a current user of cocaine and marijuana which renders the father incapable of providing regular care and supervision of the child," that Alec had "a positive toxicology screen for cocaine and marijuana," and that Alec "had a criminal history of conviction of possession of narcotic[s], controlled substance, and that his illicit drug use endangered the child's physical health and safety, places the child at risk of serious physical harm." Trial Tr. Vol. 2, pp. 202–03. The trial court admitted this document for the limited purpose of "showing how the document may have had an effect on [Jackson] and perhaps future actions." *Id*. at 200. Jackson and his wife, Michelle, also testified at trial regarding Alec's allegedly threatening behavior toward them. Indeed, Michelle testified that Alec had a history of physically abusing her, and Jackson testified that Alec had threatened him in the past. *See* Trial Tr. Vol. 2, pp. 111–12, 156, 161–62, 177–78, 182–83, 191. As noted by the State, none of these incidents were reported to the police and would therefore not have been included in Alec's official criminal history.

[26]     Accordingly, even without the admission of Alec's certified criminal record, the jury was made well aware of Jackson's claims that he was afraid of Alec, and the jury was presented with evidence of Alec's criminal history in California. And Jackson has not demonstrated that he was personally aware of any additional information regarding Alec's criminal history that was not already presented to the jury. Under these facts and circumstances, we agree with the post-conviction court that Jackson "failed to show how certified records of Alec McCloud's prior convictions would have overcome the standard that [Jackson]

must have had personal knowledge of those convictions at the time of the shooting, or that they would not be cumulative of that knowledge." Appellant's App. p. 78. In short, Jackson has not demonstrated that his trial counsel's failure to obtain certified copies of Alec's criminal history constituted deficient performance.

## Conclusion

The post-conviction court did not clearly err in concluding that Jackson was not denied the effective assistance of trial counsel. Trial counsel's failure to depose various witnesses did not constitute deficient performance, nor did counsel's failure to introduce certified copies of Alec's criminal record. We therefore affirm the judgment of the post-conviction court.

Affirmed.

Bradford, C.J., and Najam, J., concur.